TROUTMAN PEPPER HAMILTON SANDERS LLP
Terrence R. McInnis, Bar No. 155416
terrence.mcinnis@troutman.com
Michael K. Cassata, Bar No. 287928
michael.cassata@troutman.com
5 Park Plaza, Suite 1400
Irvine, CA  92614-2545
Telephone: 949.622.2700
Facsimile:  949.622.2739

Attorneys for Plaintiff
CERTAIN UNDERWRITERS AT LLOYD'S,
LONDON, SYNDICATE 2623

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| CERTAIN UNDERWRITERS AT LLOYD'S, LONDON, SYNDICATE 2623, | Case No. 2:22-cv-01324-CAS-E |
| Plaintiff, | **EXHIBITS TO PLAINTIFF'S COMPLAINT [DKT. 1]** |
| v. | |
| OXGORD, INC., and DAY TO DAY IMPORTS, INC., | |
| Defendants. | |

Plaintiff Certain Underwriters at Lloyds, London, Syndicate 2623 ("Plaintiff") respectfully submits the following Exhibits to Plaintiff's Complaint for Declaratory Relief [Dkt. 1] (the "Complaint") filed February 25, 2022.  Attached hereto as Exhibit "A", Exhibit "B" and Exhibit "C" are the documents referenced in the Complaint as being attached thereto, and bearing the same designation.

1

2   Dated:      March 2, 2022                    TROUTMAN PEPPER HAMILTON
                                                 SANDERS LLP

3

4                                                By:          /s/Michael K. Cassata

5                                                      Terrence R. McInnis
                                                      Michael K. Cassata
6                                                      Attorneys for Plaintiff
                                                      CERTAIN UNDERWRITERS AT
7                                                      LLOYD'S, LONDON SYNDICATE 2623

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

TROUTMAN PEPPER HAMILTON SANDERS LLP
5 PARK PLAZA
SUITE 1400
IRVINE, CA 92614-2545

2
EXHIBITS TO PLAINTIFF'S COMPLAINT

# Exhibit A



# Lloyd's Certificate

This Insurance is effected with certain Underwriters at Lloyd's, London.

This Certificate is issued in accordance with the limited authorization granted to the Correspondent by certain Underwriters at Lloyd's, London whose syndicate numbers and the proportions underwritten by them can be ascertained from the office of the said Correspondent (such Underwriters being hereinafter called "Underwriters") and in consideration of the premium specified herein, Underwriters hereby bind themselves severally and not jointly, each for his own part and not one for another, their Executors and Administrators.

The Assured is requested to read this Certificate, and if it is not correct, return it immediately to the Correspondent for appropriate alteration.

All inquiries regarding this Certificate should be addressed to the following Correspondent:

Thompson Heath & Bond Limited
107 Leadenhall Street
London
EC3A 4AF

**SLC-3 (USA)** NMA2868 (24/08/00)  **Form approved by Lloyd's Market Association**

# CALIFORNIA SURPLUS LINES NOTICE 1 (POST BIND)

## IMPORTANT NOTICE

1.	The insurance policy that you have purchased is being issued by an insurer that is not licensed by the State of California. These companies are called "nonadmitted" or "surplus line" insurers.

2.	The insurer is not subject to the financial solvency regulation and enforcement that apply to California licensed insurers.

3.	The insurer does not participate in any of the insurance guarantee funds created by California law. Therefore, these funds will not pay your claims or protect your assets if the insurer becomes insolvent and is unable to make payments as promised.

4.	The insurer should be licensed either as a foreign insurer in another state in the United States or as a non-United States (alien) insurer. You should ask questions of your insurance agent, broker, or "surplus line" broker or contact the California Department of Insurance at the toll-free number 1-800-927-4357 or internet website **www.insurance.ca.gov**. Ask whether or not the insurer is licensed as a foreign or non-United States (alien) insurer and for additional information about the insurer. You may also visit the NAIC's internet website at **www.naic.org**. The NAIC – the National Association of Insurance Commissioners – is the regulatory support organization created and governed by the chief insurance regulators in the United States.

5.	Foreign insurers should be licensed by a state in the United States and you may contact that state's department of insurance to obtain more information about that insurer.

You can find a link to each state from the NAIC internet website: **https://naic.org/state_web_map.htm**.

**6.    For non-United States (alien) insurers, the insurer should be licensed by a country outside of the United States and should be on the NAIC's International Insurers Department (IID) listing of approved nonadmitted non-United States insurers. Ask your agent, broker, or "surplus line" broker to obtain more information about that insurer.**

**7.    California maintains a "List of Approved Surplus Line Insurers (LASLI)." Ask your agent or broker if the insurer is on that list, or view that list at the internet website of the California Department of Insurance: www.insurance.ca.gov/01-consumers/120-company/07-lasli/lasli.cfm.**

**8.    If you, as the applicant, required that the insurance policy you have purchased be effective immediately, either because existing coverage was going to lapse within two business days or because you were required to have coverage within two business days, and you did not receive this disclosure form and a request for your signature until after coverage became effective, you have the right to cancel this policy within five days of receiving this disclosure. If you cancel coverage, the premium will be prorated and any broker's fee charged for this insurance will be returned to you.**

LMA9098B
10 December 2019

**CALIFORNIA COMPLAINTS NOTICE**

To request assistance or make an initial complaint, you should contact the broker who placed this policy on your behalf.

In the alternative, or if you are dissatisfied with the resolution of your complaint by the above party, you may wish to contact the Lloyd's Complaints Department at:

**Lloyd's Complaints Department**
**c/o Lloyd's America Inc.**
**25 West 53rd Street, 14th Floor**
**New York, NY 10019**
**USA**

**Phone:  1-844-849-7828**
**Fax:      1-800-481-3121**
**Email:   complaints@lloyds.com**

The California Department of Insurance should be contacted only after discussions with the insurer, its agent, or representative, have failed to produce a satisfactory resolution.  You may contact the California Department of Insurance to obtain information on your rights or make a complaint at:

**Consumer Hotline**
**1-800-927-4357 (HELP)**

**TDD Number**
**1-800-482-4833 (TTY)**

**California Department of Insurance**
**Consumer Services Division**
**300 South Spring Street, South Tower**
**Los Angeles, CA 90013**

*LMA9136*
*08 December 2016*

**CERTIFICATE PROVISIONS**

1. **Signature Required.** This Certificate shall not be valid unless signed by the Correspondent on the attached Declaration Page.

2. **Correspondent Not Insurer.** The Correspondent is not an Insurer hereunder and neither is nor shall be liable for any loss or claim whatsoever. The Insurers hereunder are those Underwriters at Lloyd's, London whose syndicate numbers can be ascertained as hereinbefore set forth. As used in this Certificate "Underwriters" shall be deemed to include incorporated as well as unincorporated persons or entities that are Underwriters at Lloyd's, London.

3. **Cancellation.** If this Certificate provides for cancellation and this Certificate is cancelled after the inception date, earned premium must be paid for the time the insurance has been in force.

4. **Service of Suit.** It is agreed that in the event of the failure of Underwriters to pay any amount claimed to be due hereunder, Underwriters, at the request of the Assured, will submit to the jurisdiction of a Court of competent jurisdiction within the United States. Nothing in this Clause constitutes or should be understood to constitute a waiver of Underwriters' rights to commence an action in any Court of competent jurisdiction in the United States, to remove an action to a United States District Court, or to seek a transfer of a case to another Court as permitted by the laws of the United States or of any State in the United States. It is further agreed that service of process in such suit may be made upon the firm or person named in the attached Declaration Page, and that in any suit instituted against any one of them upon this contract, Underwriters will abide by the final decision of such Court or of any Appellate Court in the event of an appeal.
The above-named are authorized and directed to accept service of process on behalf of Underwriters in any such suit and/or upon request of the Assured to give a written undertaking to the Assured that they will enter a general appearance upon Underwriters' behalf in the event such a suit shall be instituted.
Further, pursuant to any statute of any state, territory or district of the United States which makes provision therefor, Underwriters hereby designate the Superintendent, Commissioner or Director of Insurance or other officer specified for that purpose in the statute, or his successor or successors in office, as their true and lawful attorney upon whom may be served any lawful process in any action, suit or proceeding instituted by or on behalf of the Assured or any beneficiary hereunder arising out of this contract of insurance, and hereby designate the above-mentioned as the person to whom the said officer is authorized to mail such process or a true copy thereof.

5. **Assignment.** This Certificate shall not be assigned either in whole or in part without the written consent of the Correspondent endorsed hereon.

6. **Attached Conditions Incorporated.** This Certificate is made and accepted subject to all the provisions, conditions and warranties set forth herein, attached or endorsed, all of which are to be considered as incorporated herein.

7. Where the word "Policy" appears herein it is deemed to mean "Certificate"

This Contract is subject to US state surplus lines requirements. It is the responsibility of the surplus lines broker to affix a surplus lines notice to the contract document before it is provided to the insured. In the event that the surplus lines notice is not affixed to the contract document the insured should contact the surplus lines broker.

This Insurance is subject to the acceptance and acknowledgement by the Insured that the terms and conditions offered (in part or in full) may have been underwritten within an authority to transact business as detailed in a Binding Authority granted by certain Underwriters at Lloyd's of London or Insurance Companies to Thompson Heath and Bond Ltd., and therefore all Thompson Heath & Bond Ltd records relating to this Insurance are available for inspection by those participating certain Underwriters at Lloyd's of London.  In relation to these Binding Authorities Thompson Heath and Bond Ltd., may receive remuneration for additional workload and/or profit commission based upon the underwriting results of business bound, of which this insurance may form a part.

Lloyd's is regulated by the Financial Conduct Authority

**Schedule of Underwriters**

This is a Declaration off of Thompson Heath & Bond Limited Delegated Underwriting Authority Number: B1230FF00032A19

Effected with

Underwriters at Lloyd's

| | |
|---|---|
| 82.000% | Syndicate 2623 |
| 18.000% | Syndicate 0623 |

-------------
100.000%
-------------

**Warranties**

If any warranties are shown on this cover note please make sure that you understand them and are able to follow their requirements exactly.  If not, please advise us immediately, as a breach of warranty may enable the underwriter to terminate the policy from the date of that breach.  This may be the position regardless of whether there is any connection between the warranty breached and the loss which leads to that breach becoming evident.

**Duty to Disclose Material Facts**

Since and insurance/reinsurance contract is based upon the duty of utmost good faith, it is important that those seeking insurance/reinsurance should provide full disclosure of all material facts to underwriters and that this information should be kept updated.  The Courts will find a fact to be "material" where it would affect the judgement of a prudent underwriter as to whether or not to accept the risk at the particular terms offered.  The practical advice, which we give to clients or producers, is this: if you are in doubt we recommend that you advise the information to insurers.

Please note also that a renewal will be based on the information which has already been provided to insurers.  Therefore if there is any change in such information which has not yet been advised, this must now be advised to insurers.

**Several Liability Notice**

The subscribing insurers' obligations under contracts of insurance to which they subscribe are several and not joint and are limited solely to the extent of their individual subscriptions.  The subscribing insurers are not responsible for the subscription of any co-subscribing insurer who for any reason does not satisfy all or part of its obligations.

08/94
LSW1001 (Insurance)

**DECLARATIONS**

**COMMERCIAL GENERAL LIABILITY - CLAIMS MADE AND REPORTED POLICY**

**THIS IS A CLAIMS MADE AND REPORTED POLICY. SUBJECT TO ITS TERMS, THIS POLICY APPLIES ONLY TO ANY CLAIM FIRST MADE AGAINST THE INSURED AND REPORTED IN WRITING TO THE UNDERWRITERS DURING THE POLICY PERIOD OR EXTENDED REPORTING PERIOD, IF APPLICABLE. DAMAGES AND CLAIMS EXPENSES SHALL BE APPLIED AGAINST THE DEDUCTIBLE. CLAIMS EXPENSES ARE WITHIN AND REDUCE THE LIMIT OF LIABILITY UNDER THIS POLICY. THE UNDERWRITERS SHALL NOT BE LIABLE FOR ANY CLAIMS EXPENSES OR FOR ANY JUDGEMENT OR SETTLEMENT AFTER THE LIMIT OF LIABILITY HAVE BEEN EXHAUSTED. PLEASE READ THIS POLICY CAREFULLY.**

These Declarations along with the completed and signed **Application** and the Policy with endorsements shall constitute the contract between the **Named Insured** and the Underwriters.

|  |  |
|---|---|
| California Premium: | 49500.00 |
| Non-Taxable Fees: | |
| Taxable Fees: | |
| Surplus Lines Tax: | 1485.00 |
| Stamping Fee: | 123.75 |

**Policy Number: CGL19070A20**

Item 1.     **Named Insured:** Day To Day Imports Inc., Oxgord Inc doing business as Paws & Pals doing business as Beverlyhills Auto Covers doing business as Carcover

**Address:**     16325 South Avalon Boulevard
Gardena
CA 90248
USA

Item 2.     **Policy Period:**

**From:**     **8 July 2020**

**To:**     **8 July 2021**

(both days at 12:01 a.m. local standard time at the address shown in Item 1. Above)

Item 3.     **Limit of Liability:**

**(defence cost inside)**

**General Aggregate: (Other than products-competed operations)**          USD 2,000,000

**Products-Completed Operations Aggregate:**          USD 2,000,000

**For Coverage A (Bodily Injury and Property Damage Liability)**

Each Occurrence:          USD 1,000,000
Fire Damage to Premises- any one fire:          USD 100,000

**For Coverage B (Personal Injury and Adverting Liability)**

Each person or Organization:                                    USD 1,000,000

**For Coverage C (Medical Payments)**

Each Person:                                                   USD 5,000

Item 4.   Each **Accident**/offense **Deductible** includes **Claims
Expenses**:                                                    USD 10,000

Item 5.   **Retroactive Date:**                                1 March 2020

Item 6.   Liability Premium                                    USD 49,500

          TRIA                                                 N/A

          Total                                                USD 49,500

          Adjustable at a rate of USD 1.41 per $1,000 revenues
          Based on revenues of USD 35,000,000

Item 7.   **Extended Reporting Period**

          a)   Premium for **Extended Reporting Period**:    **i.**    100% of the total premium
                                                                       for this Policy

                                                             **ii.**   175% of the total premium
                                                                       for this   Policy

                                                             **iii**.  225% of the total premium
                                                                       for this Policy

          b)   Length of **Extended Reporting Period**:     **i.**    12 months

                                                             **ii**.   24 months

                                                             iii.      36 months

Item 8.    **Notification under this Policy:**

Beazley Group PLC

30 Batterson Park Road

Farmington, CT 06032, USA

T +1 (860) 667 3700

claims@beazley.com

Item 9.    **Service of Suit:**

Eileen Ridley
FLWA Service Corp.
c/o Foley & Lardner LLP
Foley & Lardner LLP,
555 California Street, Suite 1700,
San Francisco, CA 94104-1520, USA

Item 10    **Choice of Law**: New York

Item 11.    **Description of insurance afforded hereunder:**

Commercial General Liability – Claims made and reported

Item 12.    **Covered Products:**

As per the client submission prepared by AmWINS Brokerage of New England and seen by all participants hereon and held on file by Thompson, Heath & Bond Limited

Item 13.    **Business Location(s):**

16325 South Avalon Boulevard
Gardena
CA 90248
USA

Item 14.    **Endorsements Effective At Inception:**

45 days Premium Payment Warranty – 623AFB00082
NMA 1256 – Nuclear Incident Exclusion Clause –Liability - Direct
NMA 1477 – Radioactive Contamination Exclusion Clause – Liability – Direct
Sanctions Limitations and Exclusion Clause - LMA 3100
War & Terrorism Exclusion Clause – NMA 2918
NMA1168 Small Additional or Return Premium Clause
Beazley Complaints Notice –as attached
LMA5390 US TRIA Not Purchased Clause
LMA9151 Data Protection Short Form Information Notice (Layer 1)

**DATED IN LONDON:**  21 August 2020

For and on behalf of
THOMPSON HEATH & BOND LTD

**GENERAL LIABILITY AND PRODUCTS/COMPLETED OPERATIONS LIABILITY CLAIMS MADE AND REPORTED INSURANCE**

**NOTICE**:   This is a Claims Made and Reported Policy. Except to such extent as may otherwise be provided herein, the coverage afforded under this insurance policy is limited to those **Claims** which are first made against the **Insured** and reported to the Underwriters during the **Policy Period** or any applicable **Extended Reporting Period**.  **Damages** and **Claims Expenses** shall be applied against the Retention. **Claims Expenses** are within and reduce the Limit of Liability under this policy.  Certain words and phrases which appear in bold type have special meaning; please refer to Section VI., Definitions. Please review the coverage afforded under this insurance policy carefully and discuss the coverage hereunder with your insurance agent or broker.

In consideration of the payment of premium and reliance upon the statements, representations and warranties made in the application which is made a part of this insurance policy (hereinafter referred to as the "Policy" or "insurance") and subject to the Limit of Liability, exclusions, conditions and other terms of this insurance, the Underwriters agree with the **Named Insured** (set forth in Item 1 of the Declarations, made a part hereof) as follows:

**I.   INSURING AGREEMENTS**

    A.    **Bodily Injury and Property Damage**

        The Underwriters will pay on behalf of the **Insured Damages** and **Claims Expenses** in excess of the Retention, which the **Insured** shall become legally obligated to pay or assumed by the **Insured** under a contract because of any **Claim** or **Claims** for **Bodily Injury** and**/**or **Property Damage** to which this coverage applies caused by an **Accident,** except as excluded or limited by the terms, conditions and exclusions of this Policy**.** This insurance applies only if:

            a)    The **Accident** and the **Bodily Injury** and **Property Damage** occurred on or after the Retroactive Date set forth in Item 6 of the Declarations and prior to the end of the **Policy Period**; and

            b)    The **Claim** or **Claims** is first made against any **Insured** during the **Policy Period** and reported in writing to the Underwriters during the **Policy Period** or any applicable **Extended Reporting Period**.

    B.    **Personal injury and Advertising Injury liability**

        The Underwriters will pay on behalf of the **Insured Damages** and **Claims Expenses** in excess of the Retention which the **Insured** shall become legally obligated to pay or assumed by the **Insured** under a contract because of any **Claim** or **Claims** for **Personal Injury** and/or **Advertising Injury** to which this coverage applies caused by an **Accident**, except as excluded or limited by the terms, conditions and exclusions of this Policy provided that:

            a)    The **Accident** and the **Personal Injury** and **Advertising Injury** occurred on or after the Retroactive Date set forth in Item 6 of the Declarations, prior to the end of the **Policy Period**; and

            b)    The **Claim** or **Claims** is first made against any **Insured** during the **Policy Period** and reported in writing to the Underwriters during the **Policy Period** or any applicable **Extended Reporting Period**.

    C.    **Products/Completed Operations Liability**

        The Underwriters will pay on behalf of the **Insured Damages** and **Claims Expenses** in excess of the Retention which the **Insured** shall become legally obligated to pay or assumed by the **Insured** under contract because of any **Claim** or **Claims** for **Bodily Injury** or **Property Damage** caused by an **Accident** within the **Products/Completed**

**Operations Liability Hazard** as stated in the Declarations except as excluded or limited by the terms, conditions and exclusions of this Policy.

This insurance applies only if:

a) The **Accident** and **Bodily Injury** or **Property Damage** occurred on or after the Retroactive Date set forth in Item 6 of the Declarations, prior to the end of the **Policy Period**; and

b) The **Claim** or **Claims** is first made against any **Insured** during the **Policy Period** and reported in writing to the Underwriters during the **Policy Period** or any applicable **Extended Reporting Period**.

D.     **Fire Legal Liability**

The Underwriters will pay on behalf of the **Insured Damages** and **Claims Expenses,** in excess of the Retention which the **Insured** shall become legally obligated to pay or assumed by the **Insured** under contract because of any **Claim** or **Claims** first made against any **Insured** during the **Policy Period** and reported in writing to the Underwriters during the **Policy Period** or or any applicable **Extended Reporting Period** for **Property Damage** to the premises, while rented to the **Named Insured**, or temporarily occupied by the **Named Insured** with permission of the owner, arising out of any one fire which occurred on or after the Retroactive Date stated in Item 6 of the Declarations and prior to the end of the **Policy Period**.

This coverage is subject to the sublimit of liability as stated in Item 3.(b)(1).ii of the Declarations. Under no circumstances will this coverage be extended to cover First Party **Property Damage** or **Property Damage** to personal property.

E.     **Medical Payments**

The Underwriters will pay medical payments, in excess of the Retention, as described below for **Bodily Injury** caused by an **Accident**:

a)   on premises the **Named Insured** owns or rents;

b)   on ways next to the premises the **Named Insured** owns or rents; or

c)   because of the **Named Insured's** operations;

Provided that:

d)   the **Accident** occurred on or after the Retroactive Date stated in Item 6. of the Declarations and prior to the end of the **Policy Period**;

e)   the **Accident** is reported in writing to the Underwriters during the **Policy Period**;

f)   the expenses are incurred and reported to the Underwriters within one year of the date of the **Accident**;

g)   the injured person submits to an examination, at the Underwriters' expense, by medical providers of the Underwriters choosing as often as the Underwriters reasonably require.

The Underwriters will make these payments regardless of fault. These payments will not exceed the applicable sublimit of liability stated in the Declarations. The Underwriters will pay reasonable expenses for:

a)   first aid administered at the time of the **Accident**;

b)   necessary medical, surgical, x-ray and dental services, including prosthetic devices; and

c)   necessary ambulance, hospital, professional nursing and funeral services.

F.     **Computer Network Security and Privacy Coverage**

1.   Computer Network Security Cover

The Underwriters will pay on behalf of the **Insured Damages** and **Claims Expenses** which the **Insured** shall become legally obligated to pay because of any **Claim** first made against any **Insured** and reported to the Underwriters during the **Policy Period** or **Extended Reporting Period** (if applicable) arising out of any act, error or omission on or after the Retroactive Date set forth in Item 6. of the Declarations and before the end of the **Policy Period** in the course of providing or managing **Computer Systems** security by the **Insured** or by any person, including an independent contractor, for whose act, error or omission the **Named Insured** is legally responsible that results in:

a)   the inability of a third party, who is authorized to do so, to gain access to **Computer Systems** or your **Technology Based Services**;

b)   the failure to prevent **Unauthorized Access** to **Computer Systems** that results in:

(1)  the destruction, deletion or corruption of electronic data on **Computer Systems**;

(2)  **Theft of Data** from **Computer Systems**; or

(3)  denial of service attacks against Internet sites or computers; or

c)   the failure to prevent transmission of **Malicious Code** from **Computer Systems** to third party computers and systems.

2.   Privacy Liability

The Underwriters will pay on behalf of the **Insured Damages** and **Claims Expenses** which the **Insured** shall become legally obligated to pay because of any **Claim**, including a **Claim** for violation of a privacy law, first made against any **Insured** and reported to the Underwriters during the **Policy Period** or **Extended Reporting Period** (if applicable) for:

a)   theft, loss or **Unauthorized Disclosure** of **Personally Identifiable Non-Public Information** or **Third Party Corporate Information** that is in the care, custody or control of the **Named Insured**, or an independent contractor that is holding or processing such information on behalf of the **Named Insured**, provided such theft, loss or **Unauthorized Disclosure** takes place on or after the Retroactive Date set forth in Item 6. of the Declarations and before the end of the **Policy Period**;

b)   the **Named Insured's** failure to timely disclose a **Security Breach** in violation of any **Breach Notice Law**; provided such **Security Breach** must take place on or after the Retroactive Date set forth in Item 6. of the Declarations and before the end of the **Policy Period**;

c)   failure by the **Insured** to comply with that part of a **Privacy Policy** that specifically:

(1)     prevents or prohibits improper or intrusive collection of **Personally Identifiable Non-Public Information** from a person;

(2)    requires notice to a person of the **Named Insured's** collection or use of, or the nature of the collection or use of his or her **Personally Identifiable Non-Public Information**;

(3)    provides a person with the ability to assent to or withhold assent for (e.g. opt-in or opt-out) the **Named Insured's** collection or use his or her **Personally Identifiable Non-Public Information**;

(4)    prohibits or restricts the **Named Insured's** disclosure, sharing or selling of a person's **Personally Identifiable Non-Public Information**;

(5)    requires the **Named Insured** to provide access to **Personally Identifiable Non-Public Information** or to correct incomplete or inaccurate **Personally Identifiable Non-Public Information** after a request is made by a person; or

(6)    mandates procedures and requirements to prevent the loss of **Personally Identifiable Non-Public Information**.

provided the acts, errors or omissions that constitute such failure to comply with a **Privacy Policy** must take place on or after the Retroactive Date set forth in Item 6. of the Declarations and before then end of the **Policy Period**, and the **Named Insured** must, at the time of such acts, errors or omissions have in force a **Privacy Policy** that addresses those subsections above that are relevant to such **Claim**.

d)    failure by the **Insured** to administer an identity theft prevention program required by governmental statute or regulation or take necessary actions to prevent identity theft, including phishing; provided the acts, errors or omissions that constitute such failure must first take place on or after the Retroactive Date set forth in Item 6. of the Declarations and before the end of the **Policy Period**.

3.   <u>Privacy Notification Costs</u>

The Underwriters will indemnify the **Named Insured** for **Privacy Notification Costs**, in excess of the Retention and incurred by the **Named Insured** with the Underwriters' prior written consent, resulting from the **Named Insured**'s legal obligation to comply with a **Breach Notice Law** because of an incident (or reasonably suspected incident) described in Insuring Agreement I.F.1.(b)(2) or I.F.2.(a) that first takes place on or after the Retroactive Date set forth in Item 6. of the Declarations and before the end of the **Policy Period**; provided such incident or suspected incident must be reported to the Underwriters during the **Policy Period**.

**Privacy Notification Costs** means reasonable and necessary:

a)    costs to hire a computer security expert to determine the existence of and cause of any Security Breach resulting in a an actual or reasonably suspected theft, loss or **Unauthorized Disclosure** of **Personally Identifiable Non-Public Information** and the extent to which such information was accessed by an unauthorized person or persons;

b)    costs to provide notification to individuals who are required to be notified by the applicable **Breach Notice Law**;

c) fees charged by an attorney to determine the applicability of and actions necessary to comply with **Breach Notice Laws** due to an actual or reasonably suspected theft, loss or **Unauthorized Disclosure** of **Personally Identifiable Non-Public Information**; and

d) costs of a credit file monitoring program, to be approved by the Underwriters, consisting of:

    (1) the offering of one (1)  year of credit monitoring services to those individuals who **Personally Identifiable Non Public Information** was compromised or reasonably believed to be compromised as a result of the theft, loss or **Unauthorized Disclosure** of information giving rise to the notification requirement pursuant to a **Breach Notice Law**; and

    (2) mailing and other reasonable third party administrative costs associated with such program;

Provided all such costs must be incurred within one (1) year of discovery of such theft, loss or **Unauthorized Disclosure** of information, be for the purpose of mitigating potential **Damages** resulting from such theft, loss or **Unauthorized Disclosure** of information and are subject to twenty percent (20%) co-insurance.

**Privacy Notification Costs** shall not include any internal salary or overhead expenses of the **Named Insured** or any costs or expenses related to public relations management.

4. Regulatory Defense and Penalties

The Underwriters will pay on behalf of the **Insured Claims Expenses** and **Penalties** which the **Insured** shall become legally obligated to pay because of any **Claim** in the form of a **Regulatory Proceeding**, first made against any **Insured** during the **Policy Period** or **Extended Reporting Period** (if applicable) and reported in writing to the Underwriters during the **Policy Period** or as otherwise provided in Section XII. of this Policy, resulting from a violation of a **Privacy Law** and caused by an incident described in Insuring Agreements I.F.1.(b)(2) or I.F.2.(a) that first takes place on or after the Retroactive Date set forth in Item 6. of the Declarations and before the end of the **Policy Period**.

## II.  DEFENSE AND SETTLEMENT

A. The Underwriters shall have the right and duty to defend the **Insured** subject to the Limit of Liability:

1. for any **Claim** first made against the **Insured** seeking payment under the terms of this insurance, even if any of the allegations of the **Claim** are groundless, false or fraudulent; or

2. under Insuring Agreement I.F.4, any **Claim** in the form of a **Regulatory Proceeding.**

The Underwriters shall choose defense counsel in conjunction with the **Insured**, but in the event of a dispute, the decision of the Underwriters is final.

B. It is agreed that the Limit of Liability available to pay **Damages, Penalties** or **Privacy Notification Costs** shall be reduced and may be completely exhausted by payment of **Claims Expenses**. **Damages, Privacy Notification Costs, Penalties** and **Claims Expenses** shall be applied against the Retention set forth in Item 4 of the Declarations.

C.  The Underwriters shall have the right to make any investigation they deem necessary, including, without limitation, any investigation with respect to coverage and statements made in the application.

D.  If the **Insured** refuses to consent to any settlement or compromise recommended by the Underwriters and acceptable to the Claimant and elects to contest or continue to contest the **Claim**, the Underwriters' liability for any **Damages, Penalties** and **Claims Expenses** shall not exceed the amount for which the **Claim** could have been settled, less the remaining Retention, plus the **Claims Expenses** incurred up to the time of such refusal, or the applicable Limit of Liability, whichever is less, and the Underwriters shall have the right to withdraw from the defense of the **Claim** by tendering control of said defense to the **Insured**.

E.  Subject to the Limit of Liability of this Policy, the Underwriters shall pay all premiums on bonds to release attachments, all premiums on appeal bonds required in any such defended suit, but without any obligation to apply for or furnish such bonds, all costs taxed against the **Insured** in any suit and all interest accruing after entry of judgment until Underwriters have paid, tendered or deposited in court part of such judgment as does not exceed the Underwriters' Limit of Liability.

F. Subject to the Limit of Liability of this Policy, the Underwriters shall reimburse the **Insured** for all reasonable expenses, other than loss of earnings, incurred at the Underwriters' request.

G.  It is further provided that the Underwriters shall not be obligated to pay any **Damages, Penalties, Privacy Notification Costs** or **Claims Expenses**, or to undertake or continue defense of any **Claim** after the applicable Limit of the Underwriters' Liability has been exhausted by payment of **Damages, Penalties, Privacy Notification Costs** or **Claims Expenses** or after deposit of the remaining applicable Limit of Liability in a court of competent jurisdiction, and that upon such payment, the Underwriters shall have the right to withdraw from the further defense of the **Claim** by tendering control of said defense to the **Insured**.

## III.  PERSONS INSURED

Each of the following is an **Insured** under this insurance to the extent set forth below:

A.  the **Named Insured** identified in Item 1 of the Declarations:

B.  if the **Named Insured** is an individual, the person so designated but only with respect to the conduct of the business of which he or she is the sole proprietor, and the **Spouse** of the **Named Insured** with respect to the conduct of such a business, and any **Employee** while acting within the scope of his or her duties as such;

C.  if the **Named Insured** is a partnership or joint venture, the partnership or joint venture so designated and any partner, **Spouse**, or member thereof but only with respect to his or her liability as such and any **Employee** or volunteer worker while acting within the scope of his or her duties as such;

D.  if the **Named Insured** is a limited liability company, the limited liability company so designated and any manager or member thereof but only with respect to this or her liability as such and any **Employee** while acting within the scope of his or her duties as such;

E.  if the **Named Insured** is other than an individual, partnership or joint venture, the organization so designated and any executive officer, director, stockholder or **Employee**, while acting within the scope of his or her duties as such.

F.  any person who previously qualified as an **Insured** under E above prior to the termination of the required relationship with the **Named Insured**, but solely with respect to an **Accident** arising solely out of the **Named Insured's Products** or operations occurring prior to the termination of the required relationship with the **Named Insured**;

G. solely with respect to the coverage provided under Insuring Agreement I.C (Products/Completed Operations Liability) any person or organization that is a landlord or lessor that might be held vicariously liable for the **Named Insured's Products** solely because such liability arose as a result of the ownership or possession of property or premises on or at which any such liability arose in the regular course of the business of the **Named Insured** (including trade shows or fairs) if the **Named Insured** is required, pursuant to a written contract or agreement executed prior to such sale, to provide such person or organization with such coverage.

H. the estate, heirs, executor, administrators, assigns and legal representatives of any **Insured** in the event of the **Insured's** death, incapacity, insolvency or bankruptcy, but only to the extent that such **Insured** would otherwise be provided coverage under this Policy.

## IV. COVERAGE TERRITORY

This insurance applies to **Accidents, Security Breaches,** violations of **Privacy Laws,** acts, errors, omissions and incidents which take place anywhere in the world, provided the **Claim** is first made against the **Insured** within the United States of America, its possessions and territories, or Puerto Rico and Canada.

## V. EXCLUSIONS

1. **Exclusions applicable to Insuring Agreements I.A (Bodily Injury and Property Damage) I.B (Personal Injury and Advertising Injury). and I.D (Fire Legal Liability).**

   The coverage under this Insurance does not apply to **Damages** or **Claims Expenses** incurred with respect to any **Claim:**

   A. arising out of **Bodily Injury**, **Personal Injury, Advertising Injury** or **Property Damage** resulting from the use of force expected or intended from the standpoint of the **Insured**; provided, however, that this exclusion does not apply to **Bodily Injury** resulting from the use of reasonable force to protect persons or property;

   B. for liability arising out of **Bodily Injury**, **Personal Injury** or **Property Damage** arising out of ownership, maintenance, operation, use or entrustment to others, **Loading or Unloading** of:

      1. any **Automobile**, aircraft or watercraft owned or operated by or rented or loaned to any **Insured**; or

      2. any other **Automobile**, aircraft or watercraft operated by any person in the course of their employment for any **Insured**;

   C. arising out of **Bodily Injury**, **Personal Injury** or **Property Damage** arising out of:

      1. the ownership, maintenance, operation, use, **Loading or Unloading** of any **Mobile Equipment** while being used in any prearranged or organized racing, speed or demolition contest or in any stunting activity or in practice or preparation for such contest or activity; or

      2. the operation or use of any snowmobile, motorcycle, moped or motorized bicycle, or trailer designed for use therewith;

   D. arising out of **Bodily Injury**, **Personal Injury**, **Property Damage** or **Advertising Injury** for which any **Insured** or their indemnitee may be held liable as a result of:

      1. causing or contributing to the intoxication of any person via alcohol and/or state approved recreational or illegal drugs;

2.      the furnishing of alcoholic beverages and/or state approved recreational drugs  to a person under legal age or under the influence of alcohol and/or state approved recreational drugs ; or

3.      any statute, ordinance or regulation relating to the sale, gift, distribution or use of alcoholic beverages and/or state approved recreational drugs.

This exclusion applies only if the **Insured** is in the business of manufacturing, distributing, selling, serving or furnishing alcoholic beverages and/or state approved recreational drugs.

E.   arising out of, or **Accident** involving, **Property Damage** to:

1.      property owned, rented or temporarily occupied by the **Named Insured** with permission of the owner, including fixtures permanently attached thereto, any costs or expenses incurred by the **Named Insured,** or any other person, organization, entity for repair, replacement, enhancement, restoration or maintenance of such property for any reason, including prevention of injury to a person or damage to another's property;

2.      premises given away, sold or abandoned by the **Named Insured**;

3.      property loaned to the **Named Insured**;

4.      personal property in the care, custody and control of the **Named INsured**;

5.      that particular part of real property on which the **Named Insured** or any contractors or subcontractors working directly or indirectly on behalf of the **Named Insured** or temporarily occupied by the **Named Insured** as to premises rented to the **Named Insured** or temporarily occupied by the **Named Insured** with permission of the owner if such **Property Damage** arises out of those operations;

6.      that particular part of any property that must be restored, repaired or replaced because the **Insured**'s work was incorrectly performed on it.

Paragraph (a) of this exclusion does not apply to **Property Damage** to premises rented to the **Named Insured** or temporarily occupied by the **Named Insured** with permission of the owner, if such **Property Damage** arises out of fire covered under Insuring Agreement I.D. (Fire Legal Liability) and subject to the sublimits of liability as described in stated in Item 3.(b).(1).ii of the Declarations.

Paragraph (2) of this exclusion does not apply if the premises are the **Insured's** work and were never occupied, rented or held for rental by the **Named Insured**.

Paragraphs (3), (4), (5) and (6) of this exclusion do not apply to liability assumed under a sidetrack agreement.

Paragraph (6) of this exclusion does not apply to **Property Damage** included in any **Products/Completed Operations Liability Hazard** coverage.

F.   arising out of **Property Damage** to premises owned or sold by the **Insured** arising out of such premises or any part thereof;

G.   arising out of any act or failure to act that falls outside the usual business operations of the **Named Insured** or that occurs away from those locations specified leased or owned by and at which the **Named Insured** carries on its usual business operations, unless such act or failure to act falls within its usual business operations.

2.   **Exclusions applicable to Insuring Agreement I.B (Personal Injury and Advertising Injury).**

The coverage under this Insurance does not apply to **Damages** or **Claims Expenses** incurred with respect to any **Claim:**

A.   related to **Advertising Injury** arising out of:

   1.   failure of performance of contract; provided, however, that this exclusion shall not apply to the unauthorized appropriation of ideas based upon alleged breach of an implied contract;

   2.   actual or alleged plagiarism, misappropriation of likeness, breach of confidence, infringement of any intellectual property right including patent, copyright, trademark, service mark, trade secret, trade dress and trade name, other than titles or slogans by use thereof, on or in connection with goods, products or services sold, offered for sale or advertised; or

   3.   incorrect description or mistake in advertised price of goods, products or services sold, offered for sale or advertised;

B.   arising out of **Personal Injury** or **Advertising Injury** caused by or at the direction of the **Insured** with the knowledge that the act would be likely to violate the rights of another and would inflict **Personal Injury** or **Advertising Injury**;

C.   based upon or arising out of **Personal Injury** or **Advertising Injury** arising out of oral or written publication of material, if done by or at the direction of the **Insured** with knowledge of its falsity;

D.   based upon or arising out of **Personal Injury** or **Advertising Injury** arising out of oral or written publication of material whose first publication took place before the Retroactive Date;

E.   based upon or arising out of **Personal Injury** or **Advertising Injury** arising out of an electronic chat room or bulletin board which the **Insured** participates in, hosts, owns or over which the **Insured** exercises control;

F.   arising out of the unauthorized use of another's name or product in any **Insured's** e-mail address, domain name, metalag, or any other similar tactics to mislead another's potential customers.

G.   based upon or arising out of any **Advertising Injury** attributable to any **Insured** whose business is:

   1.   advertising, broadcasting, publishing or telecasting;

   2.   designing or determining content for websites for others; or

   3.   an internet access, content search or service provider.

3.   **Exclusions applicable to Insuring Agreement I.C (Products/Completed Operations Liability Hazard)**

The coverage under this Insurance does not apply to **Damages** or **Claims Expenses** incurred with respect to any **Claim:**

A.   based upon an express or implied warranty or guarantee, or breach of contract in respect of any agreement to perform work for a fee;

B.   arising out of loss of use of tangible property which has not been physically injured or destroyed resulting from:

1.   a delay in or lack of performance by or on behalf of the **Named Insured** of any contract or agreement; or

2.   the failure of the **Named Insured's Products** or work performed by or on behalf of the **Named Insured** to meet the level of performance, quality, fitness or durability warranted or represented by the **Named Insured**;

provided that this exclusion does not apply to loss of use of other tangible property resulting from the sudden and accidental physical injury to or destruction of the **Named Insured's Products** or work performed by or on behalf of the **Named Insured** after such products or work have been put to use by any person or organization other than an **Insured**;

C.   arising out of **Property Damage** to the **Named Insured's Products**, or for the cost of inspecting, repairing or replacing any defective or allegedly defective product or part thereof or for loss of use of any defective or allegedly defective product;

D.   arising out of **Property Damage** to work performed by or on behalf of the **Named Insured** arising out of the work or any portion thereof, or out of materials, parts or equipment furnished in connection therewith;

E.   arising out of the withdrawal, recall, inspection, repair, replacement, adjustment, removal, disposal or loss of use of the **Named Insured's Products** or work completed by or for the **Named Insured** or of any property of which such products or work form a part, if such products, work or property are withdrawn from the market or from use because of any known or suspected or alleged defect, deficiency, inadequacy or dangerous condition therein;

F.   arising out of any **Named Insured's Products** manufactured, handled, sold, developed, designed, created, tested, leased, licensed, rented, handled, marketed, disposed of or distributed, or work completed, by the **Insured** or by others operating under the direction or control of the **Insured** in violation of any law, statute, ordinance or regulation;

G.   arising out of the actual, alleged or threatened, inhalation of, ingestion of, contact with, exposure to, existence of, or presence of latex allergens;

**4.   Exclusions applicable to Insuring Agreement I.E., Medical Payments**

The Underwriters will not pay medical payments for **Bodily Injury**:

A.   to any **Insured**;

B.   to a person hired to do work for or on behalf of any **Insured** or a tenant of the **Insured**;

C.   to a person injured on that part of the premises the **Insured Organization** owns or rents that the person normally occupies;

D.   to a person, whether or not an **Employee** of any **Insured**, if benefits for the **Bodily Injury** are payable or must be provided under a workers' compensation or disability benefits law or a similar law;

E.   to a person injured while taking part in athletics;

F.   due to war, whether or not declared, or any act or condition incidental to war.  War shall include civil war, insurrection, rebellion or revolution;

G.      excluded under Section V.1 above;

H.      to any prisoner.

**5.      Exclusions applicable to all Insuring Agreements**

The coverage under this Insurance does not apply to **Damages, Penalties** or **Claims Expenses** incurred with respect to any **Claim** or to any **Privacy Notification Costs:**

A.      arising out of the rendering of or failure to render any professional services by any **Insured** or by any person or organization for whose acts or omissions the **Named Insured** is legally responsible;

B.      based upon or arising out of the **Insured's** activities as a fiduciary under the Employee Retirement Income Security Act of 1974;

C.      arising out of any **Insured's** activities as a trustee, partner, officer, director or employee of any trust, charitable organization, corporation, company or business other than that of the **Named Insured**;

D.      arising out of failure to pay any bond, interest on any bond, any debt, financial guarantee or debenture;

E.      arising out of any criminal, dishonest, fraudulent or malicious act, error or omission of any **Insured**, committed with actual criminal, dishonest, fraudulent or malicious purpose or intent;

F.      arising out of or relating to any liability under any contract or agreement, whether written or oral, unless:

        1.      such liability would have attached to the **Insured** in the absence of such contract or agreement; or

        2.      such liability was assumed by the **Insured** in an **Insured Contract**, provided the **Bodily Injury** or **Property Damage** occurs subsequent to the execution of that **Insured Contract**;

G.      made by or against or in connection with any business enterprise (including the ownership, maintenance or care of any property in connection therewith), not named in the Declarations, which is owned by any **Insured** or in which any **Insured** is a trustee, partner, officer, director or employee;

H.      or circumstance which might lead to a **Claim** in respect of which any **Insured** has given notice to any insurer of any other policy or self insurance in force prior to the Inception Date of this **Policy**;

I.      or circumstance which might lead to a **Claim** known to any **Insured** prior to the Inception Date of this **Policy** and not disclosed to the Underwriters at that Inception Date;

J.      or circumstance that might lead to a **Claim** arising out of any **Accident,** act, error or omission, incident, **Security Breach,** violation of **Privacy Law**, **Bodily Injury, Property Damage, Personal Injury** or **Advertising Injury** which first took place, or is alleged to have taken place, prior to the Retroactive Date;

K.      arising out of discrimination including discriminatory employment practices, allegations of actual or alleged violations of civil rights or acts of discrimination based entirely or in part on the race, gender, pregnancy, national origin, religion, age or sexual orientation;

L.     directly or indirectly arising out of:

    1.    the actual, alleged or threatened discharge, dispersal, release or escape or failure to detect the presence of **Pollutants**, except that this exclusion shall not apply to (i) **Personal Injury** sustained by any patient, visitor or invitee; and (ii) **Bodily Injury** or **Property Damage** arising out of heat, smoke or fumes from a **Hostile Fire**;

    2.    the manufacture, distribution, sale, resale, rebranding, installation, repair, removal, encapsulation, abatement, replacement or handling of, exposure to or testing for **Pollutants** contained in a product, carried on clothing, inhaled, transmitted in any fashion or found in any form whatsoever;

    3.    any governmental or regulatory directive or request that the **Insured** or anyone acting under its direction or control to test for, monitor, clean up, remove, contain, treat, detoxify or neutralize said **Pollutants**;

M.     arising out of the insolvency or bankruptcy of any **Insured** or of any other entity including the failure, inability, or unwillingness to pay **Claims**, losses or benefits due to the insolvency, liquidation or bankruptcy of any such individual entity;

N.     arising out of:

    1.    any conduct, physical act, gesture, or spoken or written words of a sexual or physically violent nature by any **Insured**, including sexual intimacy (whether or not consensual), sexual molestation, sexual or physical assault or battery, sexual abuse, sexual harassment or exploitation; or

    2.    the **Insured's** actual or alleged negligent employment, investigation, supervision, hiring, training or retention of any employee**, Insured** or person for whom the **Insured** is legally responsible and whose conduct falls within paragraph (1), above;

O.     for damages which are a multiple of compensatory Damages, fines, sanctions, taxes or penalties, or the voluntary or involuntary return of or reimbursement for fees, costs or expenses charged by any **Insured** whether by offset or otherwise;

P.     arising out of **Bodily Injury** or **Personal Injury** to any **Employee** or volunteer worker of the **Insured** arising out of and in the course of his employment by the **Insured**, or under any obligation for which the **Insured** or any carrier as his insurer may be liable, under any Workers' Compensation, Unemployment Compensation, or Disability Benefits Law.

Q.     based upon or arising out of a violation or alleged violation of the Securities Act of 1933, or the Securities Exchange Act of 1934, or any State Blue Sky or securities law;

R.     or actual or alleged violation of the Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C. §1961 et seq.;

S.     arising from costs of complying with physical modifications to any premises or any changes to the **Insured's** usual business operations mandated by the Americans with Disabilities Act of 1990;

T.     based upon or arising out of any actual or alleged unfair or deceptive trade practice or violation of any federal, state, or local anti-trust, restraint of trade, unfair competition, or price fixing law, or consumer protection;

U.     caused directly or indirectly, in whole or in part, by:

    1.    any fungus(es) or spore(s);

2. any substance, vapor or gas produced by or arising out of any fungus(es) or spore(s); or

3. any materials, product, building component, building or structure that contains, harbours, nurtures or acts as a medium for any fungus(es) or spore(s);

regardless of any other cause, event, material, product and/or building component that contributed concurrently or in any sequence to that injury or **Damages, Privacy Notification Costs** and/or **Penalties**;

For the purposes of this exclusion:

1. "Fungus(es)" includes any form of mold, mushroom or mildew.

2. "Spore(s)" means any reproductive body produced by or arising out of any fungus(es).

V. arising out of any action, investigation or proceeding brought by or on behalf of any federal, state or local governmental, regulatory or administrative agency, regardless of the name in which such action or proceeding is brought, including, but not limited to, the Health Insurance Portability and Accountability Act of 1996, the Social Security Act, 42 U.S.C. §1320a, et. seq., or similar state or federal statute, regulation or executive order promulgated thereunder. There is no coverage for any allegations of any criminal activity by the federal government, whether or not such allegation is valid. In addition, there is no coverage for any fines for illegal or criminal activities.

W. arising out of the failure to follow any city, county or state ordinances or the allegation thereof.

X. arising out of any **Insured's** data processing services, including :

1. conversion of data from source material into media for processing on the **Insured's** electronic data processing system;

2. processing of data by the **Insured** on the **Insured's** electronic data processing system; or

3. design or formulation of an electronic data processing program or system;

4. any liability arising from:

   a) the failure of any program, instruction or data for use in any computer or other electronic processing device, equipment or system to function in the manner expected or intended;

   b) the transmission or receipt of any virus, program or code that causes loss or damages to any computer system and /or prevents or impairs its proper function or performance; or

   c) the **Unauthorized Access** to any computer system.

Y. based on the willful non-compliance of any **Insured** with any Food and Drug Administration ("FDA") rules, regulations, and statutes found at Food and Drugs, 21 C.F.R. Chapter 1 § 1.1 to § 1299, or treating a patient with any drugs, medical devices, biologics or radiation-emitting products that have been disapproved or not then approved by the FDA or equivalent;

Z. based upon or arising out of any **Insured** gaining any profit, remuneration or advantage to which such **Insured** was not legally entitled;

AA.     against any subsidiary designated in the Declarations or its past, present, or future employees, directors, officers, trustees, review board or committee members, or volunteers acting in their capacity as such, which are based upon, arise out of, directly or indirectly result from, are in consequence of, or in any way involve any fact, circumstance, situation, transaction, event, **Accident, Security Breach,** violations of **Privacy Laws,** or acts, errors or omissions or related series thereof facts, circumstances, situations, transactions, events, **Security Breaches,** violations of **Privacy Law** or **Accidents** happening before the date such entity became a subsidiary or after completion of its sale or disposition by the **Named Insured**;

BB.     relating to or arising out of actual or alleged **Bodily Injury** or **Property Damage** caused by  asbestos, or lead;

CC.     based upon, arising out of, or resulting from any actual or alleged: (1) failure to obtain, effect, or maintain any form, policy, plan or program of insurance, stop loss or provider excess coverage, reinsurance, self-insurance, suretyship, or bond; (2) commingling, mishandling of or liability to pay, collect or safeguard funds; or (3) failure to collect or pay premiums, commissions, brokerage charges, fees or taxes;

DD.     arising out of **Bodily Injury**, **Personal Injury, Property Damage** or **Advertising Injury** due to war, whether or not declared, civil war, insurrection, rebellion or revolution or to any act or condition incidental to any of the foregoing;

EE.     arising out of or relating to any loss, damage, or cost or expense of whatsoever nature directly or indirectly caused by, resulting from happening through, arising out of or in connection with any **Act of Terrorism**, regardless of any other cause contributing concurrently or in any other sequence to the loss, damage, cost or expense.

        "**Act of Terrorism**" means an act or threat of violence or an act harmful to human life, tangible or intangible property or infrastructure with the intention or effect of influencing any government or to put the public or any section of the public in fear.  In any action, suit or other proceedings where the Underwriters allege that by reason of this exclusion a loss, damage, cost or expense in not covered by this **Policy**, the burden of proving that such loss, damage, cost or expense is covered shall be upon the **Insured**.

FF.     brought against any **Insured** by another **Insured** hereunder;

GG.     arising out of or resulting from the distribution of unsolicited email, direct mail or facsimiles, or telemarketing;

HH.     arising out of or resulting from the existence, emission or discharge of any electromagnetic field, electromagnetic radiation or electromagnetism that actually or allegedly affects the health, safety or condition of any person, or the environment, or that affects the value, marketability, condition or size of any property;

II.     arising out of the operations performed or products that are compounded, blended, manufactured, distributed or sold by any **Insured** or additional insured that contain any product or substance that is that is banned or prohibited by the FDA or any sports organization or federation, including but not limited to the list of substances banned by the National Football League as of the inception date of the policy.

JJ.     associated with implementation of any compliance program or any policies, procedures or practices relating to participation as a provider of medical services to a managed care organization or under a healthcare benefit program, whether initiated voluntarily or pursuant to direction by, order of, or in settlement with a government body, hospital, healthcare facility or managed care organization;

KK.    arising out of **Bodily Injury**, **Property Damage, Advertising Injury** or **Personal Injury** to:

     1.      any **Employee** or volunteer of the **Named Insured** arising out of and in the course of his employment or retention by the **Named Insured**; or

     2.      the **Spouse**, child, parent, brother or sister of the **Employee** as a consequence of paragraph (1) above.

   This exclusion applies:

     1.      whether the **Insured** may be liable as an employer or in any other capacity; and

     2.      to any obligation to share **Damages** with or repay someone else who must pay **Damages** arising out of such liability;

LL.    for **Bodily Injury**, **Personal Injury, Property Damage** or **Advertising Injury** arising directly or indirectly out of:

     1.   any action or omission that violates or is alleged to violate the Telephone Consumer Protection Act (TCPA), including any amendment of or addition to such law;

     2.   any action or omission that violates or is alleged to violate the CAN-SPAM Act of 2003, including any amendment of or addition to such law;

     3.   any action or omission that violates or is alleged to violate he Fair Credit Reporting Act (FCRA), and any amendment of or addition to such law, including the Fair and Accurate Credit Transaction Act (FACTA); or

     4.   any action or omission that violates or is alleged to violate any federal, state or local statute, ordinance or regulation, other than the TCPA, CAN-SPAM Act of 2003 or FCRA and their amendments and additions, that addresses, prohibits, or limits the printing, dissemination, disposal, collecting, recording, sending, transmitting, communicating or distribution of material or information.

     5.   any functioning, non-functioning, improperly functioning, availability or unavailability of:

         1.   The internet or similar facility; or

         2.   Any intranet or private network or similar facility; or

         3.   Any website, bulletin board, chat room, search engine, portal or similar third party application service.

     6.   any alteration, corruption, destruction, distortion, erasure, theft or other loss of or damage to data, software, information repository, microchip, integrated system or similar device in any computer equipment or non-computer equipment or any kind of programming or instruction set;

     7.   any loss of use or functionality, whether partial or entire, of data, coding, program, software, any computer or computer system or other device dependent upon any microchip or embedded logic and any ensuing inability or failure of any insured to conduct business; or

     8.   any alteration, breach, corruption, destruction, or failure of any computer, network systems or firewalls.

MM.    or **Accident**:

     1.   Which results from any act, error, omission, condition, illness or disease of the human body, work, business or operations which took place, performed by or on

     behalf of the **Insured** on or prior to the Retroactive Date set forth in Item 6 of the Declarations; and/or

    2.   Which results from any act, error, omission, condition, illness or disease of the human body, work, business or operations performed by or on behalf of the **Insured** which act, error, omission, condition, illness or disease of the human body, work, business or operations has commenced or is pending on or prior to the Retroactive Date set forth in Item 6 of the Declarations.

NN.    arising out of and in the course of the transportation of **Mobile Equipment** by any **Automobile** owned or operated by or rented or loaned to any **Insured**;

OO.    arising out of any actual  or alleged antitrust violation, restraint of trade, unfair competition, violation of the Sherman Anti-Trust Act, the Clayton Act, the Robinson-Patman Act, as amended, violation of consumer protection laws (except consumer privacy protection laws) or false, deceptive or unfair trade practices or false or deceptive or misleading advertising.

PP.    arising out of any use of illegal drugs.

QQ.    with respect to coverage provided under Insuring Agreement I.F.2 (Privacy Liability), arising out or resulting from:

    1.   the distribution of unsolicited email, direct mail or facsimiles;

    2.   telemarketing; or

    3.   the collection of information by means of electronic "spiders", "spybots", "spyware" or similar means, wire tapping or bugging, video cameras or radio frequency identification tags;

RR.    with respect to coverage provided under Insuring Agreement I.F.2 (Privacy Liability):

    1.   against any individual **Insured** if the **Claim** arises out of or results from any intentional violation of a **Privacy Policy** if committed by such **Insured** or by others if the **Insured** colluded or participated in any such conduct or activity;

    2.   against the **Named Insured** if the **Claim** arises out of or results from any intentional violation of a **Privacy Policy**, if committed by any of the **Named Insured's** principals, directors, officers, partners or trustees or any person in participation or collusion with any of the **Named Insured**'s principals, directors, officers, partners or trustees.

SS.    with respect to coverage provided under Insuring Agreement I.F, arising out of or resulting from **Bodily Injury** and **Property Damage.** For the purposes of this exclusion, **Bodily Injury** shall also mean mental injury, mental illness, mental anguish, humiliation, emotional upset, shock or other similar condition.

TT.     with respect to coverage provided under Insuring Agreements I.A., I.B., IC., I.D and I.E., arising out of or resulting from the actual, alleged or threatened inhalation of, ingestion of, contact with, exposure to, existence of or presence of pennyroyal oil or its derivatives.

UU.    arising out of Chromium VI deposits which may or may not be released during the vaping process.

## VI.  DEFINITIONS

Wherever used in this Policy, the bolded terms have the meaning provided:

A.      **"Accident"** means an unintended and unexpected event, including continuous or repeated exposure to substantially the same general harmful conditions, and involves one or more persons or entities, and which results in **Bodily Injury, Property Damage, Personal Injury** or **Advertising Injury.**

B.      **"Advertising Injury"** means injury arising out of one or more of the following offenses which occurs in the course and scope of the **Insured's** advertising activities:

      1.      libel, slander or defamation;

      2.      infringement of copyright, title, slogan, trade dress, or advertising idea;

      3.      piracy or idea misappropriation under an implied contract; or

      4.      invasion of right of privacy.

C.      "**Automobile**" means a land motor vehicle, trailer or semi-trailer designed for travel on public roads (including any machinery or apparatus attached thereto), but does not include **Mobile Equipment**, as hereinafter defined.

D.      "**Battery"** means a container consisting of one or more cells in which chemical energy is converted into electricity and used as a source of power.

E.      "**Breach Notice Law**" means any state, federal or foreign statute or regulation that requires notice to persons whose **Personally Identifiable Non-Public Information** was accessed or may reasonably have been accessed by an unauthorized person.

F.      **"Bodily Injury"** means physical injury (including death resulting therefrom), allergies, sickness, disease or disability. **Bodily Injury** shall not mean mental injury, mental illness, mental anguish, humiliation, emotional upset, shock or other similar condition.

G.      "**Claim**" means:

      1.       a written notice received by the **Insured** of an intention to hold the **Insured** responsible for compensation for **Damages**, including the service of suit or institution of arbitration proceedings against the **Insured** and;

      2.      with respect to Insuring Agreement I.F.4 only, institution of a **Regulatory Proceeding.**

H.      "**Claims Expenses**" means:

      1.      reasonable and customary fees charged by an attorney(s) designated and agreed by the Underwriters in consultation with the **Insured**, but subject always to the Underwriters' final decision; and

      2.      fees, costs and expenses resulting from the investigation, adjustment, defense and appeal of a **Claim**, if incurred by the Underwriters, or by the **Insured** with the written consent of the Underwriters.

      **Claims Expenses** does not include any salary, overhead or other charges by the **Insured** for any time spent in cooperating in the defense and investigation of any **Claim** or circumstance which might lead to a **Claim.**

I.  **"Control Group"** means the individuals holding the following positions in the **Named Insured**: President; members of the Board of Directors; executive officers, including the Chief Executive Officer, Chief Operating Officer, and Chief Financial Officer; General Counsel, staff attorneys employed by the **Named Insured**; Chief Information Officer; Chief Security Officer; Chief Privacy Officer; manager; and any individual in a substantially similar position as those referenced above, or with substantially similar responsibilities as those referenced above, irrespective of the exact title of such individual and any individual who previously held any of the above referenced positions.

J.  "**Damages**" means a civil monetary judgment, award or settlement (provided such settlement is agreed to in writing by Underwriters) and does not  include:

1.  the restitution or reimbursement of compensation, fees, costs  and/or expenses charged by any **Insured** whether by offset or otherwise; or

2.  judgments or awards deemed uninsurable by law.

3.  fines, penalties, sanctions, taxes or exemplary, multiplied or punitive damages.

K.  **"Employee"** means a person on the **Insured's** regular payroll, with federal and, if applicable, State taxes withheld, whose work is directed or controlled by the **Insured**, including part-time and seasonal **Employees** and leased workers. **Employee** does not include a temporary worker.

L.  **"Extended Reporting Period**", if applicable, means the 12 month period of time after the end of the **Policy Period** for:

1.  reporting **Claims** for **Bodily Injury, Property Damage, Personal Injury** and/or **Advertising Injury** caused by **Accidents** as long as:

a)  These **Accidents** take place prior to the end of the **Policy Period** but subsequent to the Retroactive Date identified in Item 6 of the Declarations; and

b)  The **Bodily Injury, Property Damage, Personal Injury** and/or **Advertising Injury** caused by these **Accidents** occurs prior to the end of the **Policy Period** but subsequent to the Retroactive Date identified in Item 6 of the Declarations.

2.  reporting **Claims** under Insuring Agreement I.F caused by acts, errors, omissions, incidents, **Security Breaches** and/or violations of **Privacy Laws** which take place prior the end of the Policy Period but subsequent to the Retroactive Date identified in Item 6 of the Declarations.

M.  **"Gross Receipts"** means **Sales** and other income, exclusive of deductions, from any other source, insofar as the **Sales** or other income relate to or emanate from the sale of the **Named Insured's Products** or operations specified in Item 10 of the Declarations performed during the **Policy Period** by or on behalf of the **Insured**.

N.  **"Hostile Fire"** means a fire which becomes uncontrollable or breaks out from where it was intended to be

O.  **"Insured Contract"**  means that part of any written contract or agreement pertaining to the **Insured's** operations or facilities under which the **Insured** assumes any tort liability of another to pay **Damages** because of **Bodily Injury** or **Property Damage** to a third person or organization, provided such contract or agreement is made prior to the **Bodily Injury** or **Property Damage**. Tort liability means a liability which would be imposed by law in the absence of any contract or agreement.

P.     **"Loading or Unloading"** means the handling of property;

    1.     after it is moved from the placed where it is accepted for movement into or onto an aircraft, watercraft or **Automobile**;

    2.     while it is in or on an aircraft, watercraft or **Automobile**; or

    3.     while it is being moved from an aircraft, watercraft or **Automobile** to the place where it is finally delivered;

but **Loading or Unloading** does not include the movement of property by means of a mechanical device, other than a hand truck, that is not attached to the aircraft, watercraft or **Automobile**.

Q.     **"Mobile Equipment"** means a land vehicle (including any attached machinery or apparatus) whether or not self-propelled:

    1.     not subject to motor vehicle registration;

    2.     maintained for use exclusively on premises owned by or rented to the **Named Insured**, including the ways immediately adjoining;

    3.     designed for use principally off public roads; or

    4.     designed or maintained for the sole purpose of affording mobility to equipment of the following types forming an integral part of or permanently attached to such vehicle:

        a)     power cranes, shovels, loaders, diggers and drills;

        b)     concrete mixers (other than the mix-in-transit type), graders, scrapers, rollers and on the road construction or repair equipment;

        c)     air-compressors, pumps and generators including spraying, welding and building cleaning equipment; or

        d)     geophysical exploration and well servicing equipment.

R.     **"Named Insured"** means the entity or person identified in Item 1 of the Declarations.

S.     "**Named Insured's Products**" means goods or products grown, processed, manufactured, sold, handled or distributed by the **Named Insured** specified in Item 10 of the Declarations or by others trading under its name, including any container thereof (other than a vehicle) but shall not include a vending machine or any property, other than such container rented to or located for use of others but not sold.

T.     "**Penalties**" means:

    1.     any civil fine or money penalty payable to a governmental entity that was imposed in a **Regulatory Proceeding** by the Federal Trade Commission, Federal Communications Commission, or any other federal, state, local or foreign governmental entity, in such entity's regulatory or official capacity; the insurability of **Penalties** shall be in accordance with the law in the applicable venue that most favors coverage for such **Penalties**; and

    2.     amounts which the **Insured** is legally obligated to deposit in a fund as equitable relief for the payment of consumer claims due to an adverse judgment or settlement of a **Regulatory Proceeding** (including such amounts required to be paid into a "Consumer Redress Fund"); but and shall not include payments to charitable organizations or disposition of such funds other than for payment

of consumer claims for losses caused by an event covered by Insuring Agreements I.F.1.(b)(2) or I.F.2.(a);

but shall not mean costs to remediate or improve **Computer Systems**, security or privacy practices, procedures or policies, audit, compliance or reporting costs, or costs to protect the confidentiality and/or security of **Personally Identifiable Non-Public Information** from theft, loss or disclosure.

U.    **"Personal Injury"** means injury, other than **Bodily Injury**, arising out of one or more of the following offenses which occurs in the course and scope of the **Insured's** business:

1.    false arrest, false imprisonment, wrongful eviction, detention or malicious prosecution;

2.    libel, slander, defamation of character or invasion of right of privacy, unless arising out of any advertising activities; or

3.    wrongful eviction from, wrongful entry into, or invasion of the right of private occupancy of a room, dwelling or premises that a person occupies, committed by or on behalf of its owner, landlord or lessor.

V.    **"Personally Identifiable Non-Public Information"** means an individual's name in combination with one or more of the following:

1.    information concerning the individual that constitutes "non-public personal information" as defined in the Gramm-Leach Bliley Act of 1999, as amended, and regulations issued pursuant to the Act;

2.    medical or heath care information concerning the individual, including "protected health information" as defined in the Health Insurance Portability and Accountability Act of 1996, as amended, and regulations issued pursuant to the Act; or

1.    the individuals social security number, drivers license or state identification number, credit, debit or other financial account numbers and associated security codes, access codes, passwords or pins that allows access to the individual's financial account information.

W.    **"Policy Period"** means the period of time between the inception date and the effective date of termination, expiration or cancellation of this insurance shown in Item 2 of the Declarations and specifically excludes any **Extended Reporting Period**.

X.    **"Pollutants"** means any solid, liquid, gaseous or thermal irritant or contaminant, including but not limited to asbestos and/or lead (or products containing asbestos and/or lead whether or not the asbestos and/or lead is or was at any time airborne as a fibre or particle, contained in a product, carried on clothing, inhaled, transmitted in any fashion or found in any form whatsoever), smoke, vapour, soot fumes, acids, alkalis, toxic chemicals and waste (waste includes materials to be recycled, reconditioned or reclaimed).

Y.    **"Privacy Law"** means a federal, state or foreign statute or regulation requiring the **Named Insured** to protect the confidentiality and/or security of **Personally Identifiable Non-Public Information**.

Z.    **"Privacy Policy"** means the internal or publicly accessible written documents that set forth the **Named Insured's** policies, standards and procedures for collection, use, disclosure, sharing, dissemination and correction or supplementation of, and access to, **Personally Identifiable Non-Public Information**.

AA.     "**Products/Completed Operations Liability Hazard**" means **Bodily Injury** and/or **Property Damage** which arise out of the **Named Insured's Products,** or operations, or reliance upon a representation or warranty made at any time with respect thereto, but only if the **Bodily Injury** or **Property Damage** occurs away from the premises owned by or rented to the **Insured,** and takes place:

1.      after physical possession of such products has been relinquished to other; or

2.      after such operations have been completed or abandoned.

"Operations" include materials, parts or equipment furnished in connection therewith. Operations shall be deemed completed at the earliest of the following times:

1.      when all operations to be performed by or on behalf of the **Insured** under the contract have been completed;

2.      when all operations to be performed by or on behalf of the **Insured** at the site of the operations have been completed;

3.      when the portion of the work out of which the **Bodily Injury** or **Property Damage** arises has been put to its intended use by any person or organization other than another contractor or sub-contractor engaged in performing operations for a principal as a part of the same project.

Operations which may require further service or maintenance work, or correction, repair or replacement because of any defect or deficiency, but which are otherwise completed, shall be deemed completed.

"**Products/Completed Operations Liability Hazard**" does not include **Bodily Injury** and/or **Property Damage** arising out of:

1.      the transportation of property, unless the injury or damage arises out of a condition in or on a vehicle not owned or operated by you, and that condition was created by the **Loading or Unloading** of that vehicle by any **Insured**; or

2.      the existence of tools, uninstalled equipment or abandoned or unused materials.

BB.     "**Property Damage**" means:

1)      physical injury to or destruction of tangible property, including consequential loss of use thereof; or

2)      loss of use of tangible property which has not been physically injured or destroyed.

CC.     "**Regulatory Proceeding**" means a request for information, civil investigative demand, or civil proceeding commenced by service of a complaint or similar proceeding brought by or on behalf of the Food and Drug Administration (FDA) Federal Trade Commission, Federal Communications Commission, or any federal, state, local or foreign governmental entity in such entity's regulatory or official capacity in connection with such proceeding.

DD.     "**Sales**" means the gross amount of money charged by the **Named Insured** or by others trading under such **Named Insured's** name for all goods and products sold or distributed during the **Policy Period** and charged during the **Policy Period** for installation, servicing or repair, and includes taxes, other than taxes which the **Named Insured** and such others collect as a separate item and remit directly to a governmental division.

EE.   **"Security Breach**" means **Unauthorized Access** of **Computer Systems**, infection of **Computer Systems** by **Malicious Code** or transmission of **Malicious Code** from **Computer Systems**, whether any of the foregoing is specifically targeted attack or a generally distributed attack. A series of continuing **Security Breaches** or related or repeated **Security Breaches** shall be considered a single **Security Breach** and be deemed to have occurred at the time of the first such **Security Breach**.

FF.   **"Spouse"** means the legal married partner or registered domestic partner of any **Insured** as recognized by their individual state.

GG.   **"Technology Based Services"** means computer and electronic technology services, including data processing, Internet services, data and application hosting, computer systems analysis, technology consulting and training, custom software programming for a specific client of the **Named Insured**, computer and software systems installation and integration, computer and software support, and network management services performed by the **Insured**, or by others acting under the **Named Insured's** trade name, for others for a fee, but shall not mean **Technology Products**.

HH.   "**Technology Products**" means a computer or telecommunications hardware or software product, or related electronic product that is created, manufactured or developed by the **Named Insured** for others, or distributed, licensed, leased or sold by the **Named Insured** to others, for compensation, including software updates, service packs and other maintenance releases provided for such products.

II.   "**Third Party Corporate Information**" means any trade secret, data, design, interpretation, forecast, formula, method, practice, credit or debit card magnetic strip information, process, record, report or other item of information of a third party not insured under this Policy which is not available to the general public and is provided to the **Insured** subject to a mutually executed written confidentiality agreement or which the **Named Insured** is legally required to maintain in confidence; however, **Third Party Corporate Information** shall not include **Personally Identifiable Non-Public Information**.

JJ.   **"Unauthorized Access"** means the gaining of access to or use of **Computer Systems** by an unauthorized person or persons or the use of **Computer Systems** in an unauthorized manner.

KK.   "**Unauthorized Disclosure**" means the disclosure of or access to information in a manner that is not authorized by the **Named Insured** and is without knowledge of, consent, or acquiescence of any member of the **Control Group**.

## VII. LIMIT OF LIABILITY

A.   The Limit of Liability stated in Item 3(a) of the Declarations as "Each **Accident"** is the Underwriters' Limit of Liability for all **Damages** and **Claims Expenses,** arising out of the same, related or continuing **Accidents** without regard to the number of **Insureds**, **Claims** or claimants with respect to Insuring Agreements I.A, I.B and I.C.

The Limit of Liability stated in Item 3(a) of the Declarations as "Each **Claim"** is the Underwriters' Limit of Liability for all **Damages, Penalties, Privacy Notification Costs** and **Claims Expenses** arising out of the same, related or continuing incidents, **Security Breaches,** violations of **Privacy Law**, acts, errors or omissions or requirements to comply with a **Breach Notice Law** without regard to the number of **Insureds**, **Claims** or claimants with respect to Insuring Agreement I.F.

All **Claims** arising out of the same, related or continuing **Accidents** or arising out of the same, related or continuing incidents, **Security Breaches,** violations of **Privacy Law,** acts, errors or omissions or requirements to comply with a **Breach Notice Law** shall be deemed to be a single **Claim.**

B.   The "Aggregate Limit" stated in Item 3.(b).(1) of the Declarations is the Underwriters' combined total Limit of Liability with respect to Insuring Agreements I.A., I.B, I.D, I.E., I.F., for all **Damages**, **Penalties**, medical payments, **Privacy Notification Costs** and **Claims Expenses** arising out of all **Accidents, Claims,** circumstances which might lead to a **Claim**, incidents, **Security Breaches,** violations of **Privacy Law,** acts, errors or omissions or requirements to comply with a **Breach Notice Law** which are covered under the terms and conditions of this Policy.

The sublimit of liability stated in Item 3.(b)(1).i of the Declarations is the aggregate limit of liability payable under this Policy for all **Damages** and **Claims Expenses** covered under Insuring Agreement I.B.

The sublimit of liability stated in Item 3.(b)(1).ii of the Declarations is the aggregate limit of liability payable under this Policy for all **Damages** and **Claims Expenses** covered under Insuring Agreement I.D.

The sublimit of liability stated in Item 3.(b)(1).iii of the Declarations is the each **Accident** limit of liability payable under Insuring Agreement I.E  of this Policy.

The sublimit of liability stated in Item 3.(b)(1).iv of the Declarations is the aggregate limit of liability under this Policy for all **Privacy Notification Costs** covered under Insuring Agreement I.F.3.

The sublimit of liability stated in Item 3.(b)(1).v of the Declarations is the aggregate limit of liability payable under this Policy for all **Claims Expenses** and **Penalties** covered under Insuring Agreement I.F.4.

The above sublimits are part of, and not in addition to, the Aggregate for the **Policy Period** stated in Item 3.(b)(1) of the Declarations.

C.   The "Aggregate Limit" stated in Item 3.(b).(2) of the Declarations is the Underwriters' total Limit of Liability with respect to Insuring Agreement I.C for all **Damages** and **Claims Expenses** arising out of all **Accidents.**

D.   Under no circumstances shall any one **Claim** trigger both the Aggregate limit stated in Item 3(b).1 on the one hand, and the Aggregate limit stated in Item 3(b).2, on the other.

E.   Neither the inclusion of more than one **Insured** under this Policy, nor the making of **Claims** by more than one person or entity shall increase the Limit of Liability.

F.   The Limit of Liability for the **Extended Reporting Period** shall be part of and not in addition to the Limit of Liability of the Underwriters for the Policy Period.

## VIII. RETENTION

A.   The Retention amount stated in Item 4.(a) of the Declarations shall be satisfied by payments by the **Insured** of **Damages, Penalties** and/or **Claims Expenses** resulting from each **Claim** first made and reported to the Underwriters during the **Policy Period** and/or any applicable **Extended Reporting Period** as a condition precedent to the payment by the Underwriters of any amounts due hereunder. The Underwriters shall be liable only for the amounts in excess of such Retention subject to the Underwriters' Limit of Liability in Item 3 of the Declarations.  The Retention is in addition to the Underwriters' Limit of Liability and not part thereof.  The **Insured** shall make direct payments within the Retention to appropriate parties designated by the Underwriters.  The Retention is to be uninsured, unless otherwise agreed to by the Underwriters. Under no circumstances shall Underwriters be called upon to pay the Retention, but the Underwriters may do so at their sole discretion.  Such payment shall in no way affect the Underwriters' ability to collect the Retention from the **Insured**.  The existence of "other insurance" shall not affect or abrogate the obligation of the **Insured** to pay the Retention as required.

B. The "Each Incident Retention" stated in Item 4.(b) of the Declarations applies separately to each incident giving rise to an obligation to incur **Privacy Notification Costs**. The Each Incident Retention shall be satisfied by monetary payments by the **Named Insured** of **Privacy Notification Costs**. Satisfaction of the Each Incident Retention is a condition precedent to the payment by the Underwriters of any amounts hereunder, and the Underwriters shall be liable only for the amounts in excess of such Each Incident Retention subject to the Underwriters' total liability not exceeding the Limits of Liability stated in Items 3.(a) and 3.(b) of the Declarations. The **Named Insured** shall make direct payments within the Each Incident Retention to appropriate other parties designated by the Underwriters.

## IX. INNOCENT INSURED

Whenever coverage under this insurance would be excluded, suspended or lost:

A. in relation to intentional, criminal, dishonest, fraudulent or malicious acts, errors or omissions by the **Insured**, and with respect to which any other **Insured** did not personally participate or personally acquiesce or remain passive after having personal knowledge thereof; or

B. because of non-compliance with any condition relating to the giving of notice to the Underwriters with respect to which any other **Insured** shall be in default solely because of the failure to give such notice or concealment of such failure by one or more **Insureds** responsible for the loss or damage otherwise covered hereunder;

the Underwriters agree that such insurance as would otherwise be afforded under this Policy shall be paid with respect to those **Insureds** who did not personally participate in committing or personally acquiesce in or remain passive after having personal knowledge of (a) one or more of the acts, errors or omissions described in any such exclusion; or (b) such failure to give notice, provided that the condition be one with which such **Insured** can comply, and after receiving knowledge thereof, the **Insured** entitled to the benefit of this section shall comply with such condition promptly after obtaining knowledge of the failure of any other **Insured** to comply therewith.

With respect to this provision, the Underwriters' obligation to pay in such event shall be in excess of the full extent of any assets of the **Insured** to whom the exclusion applies and shall be subject to the terms, conditions and limitations of this Policy.

## X. EXTENDED REPORTING PERIOD

A. In the event of cancellation or non-renewal of this insurance by the Underwriters or by the **Named Insured**, the **Named Insured** designated in Item 1 of the Declarations shall have the right, upon payment in full and not proportionally or otherwise of an additional premium to be determined by the Underwriters at the time of cancellation or non-renewal (such additional premium to be no less than 100% of the premium charged for this Insurance),  to a 12 month **Extended Reporting Period** for **Claims** first made against the **Insured** and reported to the Underwriters during the **Extended Reporting Period**, arising out of **Accidents,** acts, errors, omissions, incidents, **Security Breaches** and/or violations of **Privacy Law** which take place prior to the end of the **Policy Period** but subsequent to the Retroactive Date identified in Item 6 of the Declarations. In order for the **Named Insured** to invoke the **Extended Reporting Period** option, the payment of the additional premium for the **Extended Reporting Period** must be paid to the Underwriters within 30 days of the non-renewal or cancellation.

B. The Limit of Liability for the **Extended Reporting Period** shall be part of, and not in addition to, the Underwriters' Limit of Liability for the **Policy Period**.

C. The quotation by the Underwriters of a different premium or Retention or Limit of Liability or changes in Policy language for the purpose of renewal shall not constitute a refusal to renew by the Underwriters.

D.      The right to the **Extended Reporting Period** shall not be available to the **Named Insured** where cancellation or non-renewal by the Underwriters is due to non-payment of premium or failure of an **Insured** to pay such amounts in excess of the applicable Limit of Liability or within the applicable Retention.

E.      All notices and premium payments with respect to the **Extended Reporting Period** shall be directed to the Underwriters through the entity named in Item 8 of the Declarations.

F.      At the commencement of the **Extended Reporting Period**, the entire premium shall be deemed earned, and in the event the **Named Insured** terminates the **Extended Reporting Period** for any reason prior to its natural expiration, the Underwriters will not be liable to return any premium paid for the **Extended Reporting Period**.

## XI.  OTHER INSURANCE

This **Insurance** shall apply in excess of the applicable Retention and any other valid and collectible insurance or self-insurance available to any **Insured**, whether such other insurance is stated to be primary, contributory, excess, contingent or otherwise, unless such other insurance is written only and identified as excess insurance over the Limit of Liability specifically of this **Policy**.

If there is any other such insurance in force at the time of any event giving rise to a **Claim** under this **Policy** the **Insured** shall promptly provide the Underwriters in writing with full details of such other insurance, including the identity of the insurer and the policy number, its terms and limits, and such further information as the Underwriters may reasonably require.

## XII. NOTICE OF CLAIM, OR CIRCUMSTANCE THAT MIGHT LEAD TO A CLAIM

A.   If any **Claim** is made against the **Insured**, the **Insured** shall immediately notify the Underwriters in writing through persons named in Item 9 of the Declarations and forward every demand, notice, summons or other process received by the **Insured** or its representative.  The **Insured's** duty to provide notice in accordance with this provision is a condition precedent to coverage.

B.   With respect to Insuring Agreement I.F.3. for a legal obligation to comply with a **Breach Notice Law** because of an incident (or reasonably suspected incident) described in Insuring Agreement I.F.1 (b)(2) and I.F.2 (a)., such incident or reasonably suspected incident must be reported to the Underwriters through persons named in Item 9. of the Declarations as soon as practicable during the **Policy Period** after discovery by the **Insured**; provided, that unless the **Insured** cancels the Policy, or the Underwriters cancel for non-payment of premium, incidents discovered by the **Insured** within sixty (60) days prior to expiration of the Policy shall be reported as soon as practicable, but in no event later than sixty (60) days after the end the **Policy Period**; provided further, that if this Policy is renewed by the Underwriters and covered **Privacy Notification Costs** are incurred because of such incident or suspected incident that was discovered by the **Insured** within sixty (60) days prior to the expiration of the Policy, and first reported during the sixty (60) day post **Policy Period** reporting period, then any subsequent **Claim** arising out of such incident or suspected incident is deemed to have been made during the **Policy Period**.

Notwithstanding the foregoing, if the **Named Insured** reasonably believes that the **Privacy Notification Costs** provided as a result of such incident or suspected incident are not likely to meet or exceed the Retention, then such incident or suspected incident may be reported at the **Named Insured's** option, but unless such incident or suspected incident is reported in accordance with the first paragraph of this Clause., there shall be no coverage for **Privacy Notification Costs** in connection with such incident or suspected incident.

C. If during the **Policy Period** the **Insured** first becomes aware of an **Accident**, act, error, omission, **Security Breach,** violation of **Privacy Policy** or  circumstance that could lead to a **Claim**, it must give written notice to the Underwriters through persons named in Item 9 of the Declarations during the **Policy Period** of:

    1.   the specific details of the act, error, omission, **Security Breach**, violation, circumstance or  **Accident**;

    2.   the injury or damage which may result or has resulted from the act, error, omission, **Security Breach**, violation, circumstance or **Accident**; and

    3.   the circumstances by which the **Insured** first became aware of the act, error, omission, **Security Breach**, violation, circumstance or  **Accident.**

Any subsequent **Claim** made against the **Insured** which is the subject of the written notice shall be deemed to have been made at the time written notice was first given to the Underwriters.

D. A **Claim** or a circumstance that might lead to a **Claim** shall be considered to be reported to the Underwriters when notice is received by the Underwriters through persons named in Item 9 of the Declarations.

E.

    1.   All **Claims** arising out of the same continuing or related act, error, omission, **Security Breach**, violation, circumstance or **Accident** or which are the subject of the written notice under Section XII.C. shall be considered one **Claim** and deemed to have been made at the time of such notice or the first of the related **Claims** if:

        a)   the **Accident**, act, error, omission, **Security Breach**, violation, circumstance which causes or is alleged to cause injury or damage affects two or more persons and is attributable to a single, direct cause;

        b)   the first **Accident**, act, error, omission, **Security Breach**, violation, circumstance occurs after the Retroactive Date and before the end of the **Policy Period**;

        c)   the first of all such related **Claims**:

            (a)   has been made within the **Policy Period**; or

            (b)   directly relates to a circumstance notified within the **Policy Period**; and

        d)   the **Named Insured** has requested in writing prior to, or within 120 days after, the Expiration Date of the **Policy Period** that the Underwriters agree to such designation as one **Claim**, such consent not to be unreasonably withheld.

    2.   If the Underwriters agree to designate such **Claims** as one **Claim** then any later related **Claims** which are made and notified within five (5) years of the Expiration Date of the **Policy Period** are hereby covered under this Policy as that one **Claim**, and will be deemed to have been notified at the date of the first designated **Claim** or notification and are subject to one Retention and one each Claim Limit.

    3.   Any **Claims**, **Damages, Privacy Notification Costs, Penalties** or **Claims Expenses** arising from any **Accident,** act, error, omission, **Security Breach**, violation, circumstance notified to the Underwriters or other insurer prior to the Inception Date shall not be included as one **Claim** or payable under this **Policy** as **Damages,  Privacy Notification Costs, Penalties** or **Claims Expenses** arising out of the same, continuing or related **Accident** act, error, omission, **Security**

**Breach**, violation, circumstance of which any **Claim** is made or notice is first given during this **Policy Period**.

4.  In the absence of any notification and agreement strictly in accordance with the above:

    a)    the Underwriters shall only be liable for each **Claim** (otherwise properly notified and payable under this **Policy**) on the basis that each remains a separate **Claim**;

    b)    no **Claim** made after expiry of the above 120 day period shall be capable of being deemed related to an earlier **Accident** act, error, omission, **Security Breach**, violation, circumstance or **Claim**.

In respect of Insuring Agreements I.A, I.B., I.C., I.D., and I.E.,. all **Bodily Injury** or **Property Damage** arising out of one lot of goods, batch, package, or run of products prepared, manufactured or acquired by the **Named Insured** (or by another trading under the **Named Insured's** name) and attributable to a single, direct cause shall be deemed to be one **Claim**.

F.  In the event of non-renewal or cancellation of this insurance, the **Insured** shall have thirty (30) days from the expiration date of the **Policy Period** to notify the Underwriters of **Claims** made against the **Insured** during the **Policy Period** which arise out of any **Accident** act, error, omission, **Security Breach** or violation, occurring prior to the termination date of the **Policy Period** and otherwise covered by this insurance.

G.  If any **Insured** shall make any **Claim** under this Policy knowing such **Claim** to be false or fraudulent, as regards amount or otherwise, this Policy shall become null and void and all coverage hereunder shall be forfeited.

## XIII. ASSISTANCE AND COOPERATION OF THE INSURED

The **Insured** shall co-operate with the Underwriters in all investigations, including regarding the application and coverage under this Policy and upon the Underwriters' request, assist in making settlements, in the conduct of suits and in enforcing any right of contribution or indemnity against any person or organization other than an **Employee** of any **Insured** who may be liable to the **Insured** because of **Accidents**, acts, errors, omissions, **Security Breaches** or violations with respect to which insurance is afforded under this Policy.  The **Insured** shall attend hearings and trials and assist in securing and giving evidence and obtaining the attendance of witnesses. The **Insured** shall not, except at its own cost, admit liability, make any payment, assume any obligation, incur any expense, enter into any settlement, stipulate to any judgment or award or otherwise dispose of any **Claim** without the consent of the Underwriters.

## XIV.  ACTION AGAINST THE UNDERWRITERS

No action shall lie against the Underwriters unless, as a condition precedent thereto, there has been full compliance with all terms of this insurance, nor until the amount of the **Insured**'s obligation to pay shall have been finally determined either by judgment or award against the **Insured** after actual trial or arbitration or by written agreement of the **Insured**, the claimant and the Underwriters.  No person or organization shall have any right under this insurance to join the Underwriters as a party to an action or other proceeding against the **Insured** to determine the **Insured**'s liability, nor shall the Underwriters be impleaded by the **Insured** or its legal representative.

## XV. BANKRUPTCY

Bankruptcy or insolvency of the **Insured** or of the **Insured's** estate shall not relieve the Underwriters of their obligations hereunder.

XVI.    **SUBROGATION**

The Underwriters waive any right of recovery against any person or organization in relation to the Underwriters' potential liability under this **Policy**, where required by the **Insured's** written contract with a client and/or vendor, because of payments made by the Underwriters for injury or damage arising out of the **Named Insured's** operations.

XVII.   **CHANGES**

Notice to any agent or knowledge possessed by any agent or by any other person shall not effect a waiver or a change in any part of this insurance or stop the Underwriters from asserting any right under the terms of this insurance; nor shall the terms of this insurance be waived or changed, except by endorsement issued to form a part of this insurance, signed by the Underwriters.

XVIII.  **MERGERS AND ACQUISITIONS**

A.  if during the **Policy Period,** the **Named Insured** is acquired by or acquires an entity (including its subsidiaries) or purchased assets or acquires liability and:

1.  the revenues of the acquiring or acquired entity or such assets or liabilities immediately prior to the date of completion of such acquisition do not exceed 10% of the **Named Insured's** annual revenues or assets respectively as specified in its most recent application for insurance to the Underwriters;

2.  the business operations of the acquiring or acquired entity are of a similar nature to those of the **Named Insured** as set forth in its most recent application for insurance; and

3.  the operations of the acquiring or acquired entity is located in the same state as the **Named Insured** or any subsidiary,

then this Policy will automatically cover the the acquiring or acquired entity, subject to the policy terms, conditions and limitations, from the date such acquisition becomes final but only for **Accidents,** acts, errors, omissions, **Security Breaches** or violations that take place subsequent to the completion of such acquisition. In the event the total amount of revenues of all acquired entities during the **Policy Period** exceed 25% of the **Named Insured's** annual revenues as set forth in its most recent application for insurance, the above provision shall no longer apply and any further mergers or acquisitions will be subject to Paragraph B., below.

B.  In the event during the **Policy Period** the **Named Insured** mergers or acquires an entity that does not fall within the criteria detailed in Paragraph A. above, or where Paragraph A. above no longer applies by virtue of the provision contained in the last sentence of Paragraph A. above, then the **Named Insured** shall be required to give written notice to the Underwriters prior to the completion of such acquisition of the **Named Insured**, and the Underwriters expressly reserve the right to request additional premium and/or to apply amended terms and conditions if this insurance is to remain in force subsequent to any acquisition.

XIX.    **ASSIGNMENT**

The interest hereunder of the **Insured** is not assignable. If the **Insured** shall die or be adjudged incompetent, this insurance shall cover the **Insured's** legal representative as the **Insured,** as would be permitted by this Policy.

## XX. CANCELLATION

This Policy may be cancelled by the **Named Insured** or by the Underwriters by sending registered or certified mail notice to the other party stating when, not less than thirty (30) days thereafter, cancellation shall be effective. However in the event of non-payment of premium by the **Named Insured**, this Policy may be cancelled by the Underwriters by sending registered or certified mail notice to the **Named Insured** stating when, not less than ten (10) days thereafter, cancellation shall be effective.

The mailing of notice as aforesaid by the Underwriters shall be sufficient proof of notice, and the insurance under this Policy shall end on the effective date and hour of cancellation stated in the notice. Delivery of such written notice either by the **Named Insured** or by the Underwriters shall be equivalent to mailing.

In the event this Policy is cancelled, as aforesaid, the expiration date of this Policy shall be the effective date of such cancellation.

If this Policy shall be cancelled by the **Named Insured**, the Underwriters shall retain the short rate proportion of the premium for the period this Policy has been in force, calculated in accordance with the Short Rate Cancellation Table. If this Policy shall be cancelled by the Underwriters, the Underwriters shall retain the pro rata proportion of the premium for the period this Policy has been in force. Notice of cancellation by the Underwriters shall be effective even though the Underwriters make no payment or tender of return premium with such notice.

## XXI.   MITIGATION OF LOSS

In the event of an **Accident** involving the **Named Insured's Products**, operations or premises covered by this **Policy**, it is a condition precedent to the Underwriters' further liability that the **Insured** shall promptly, at its expense, take all reasonable steps (including positive action as necessary) to prevent or mitigate other or further **Bodily Injury** or **Property Damage** or consequential loss, damage or liability from arising out of such **Accident** or the same or similar conditions, and the Underwriters shall not be liable for any such failure of the **Insured** to do so.

## XXII.   SINGULAR FORM OF A WORD

Whenever the singular form of a word issued, herein, the same shall include the plural when required by context.

## XXIII.   REPRESENTATIONS AND ENTIRE AGREEMENT

By acceptance of this Policy, the **Insured** agrees that the statements in the Declarations and application are its, his or her agreements and representations, that such agreement and representations are and/or were material to the issuance of this Policy, that this insurance is issued in reliance upon the truth of such representations and that this Policy embodies all agreements existing between the **Insured** and the Underwriters relating to this insurance.

This policy, the Declarations, the application (s) and any written endorsements attached hereto shall be deemed to be a single unitary contract.

## XXIV.   NUCLEAR INCIDENT EXCLUSION

The insurance provided by this Policy does not apply:

A.      To injury sickness, disease, death or destruction

1.      with respect to which an **Insured** under this Policy of insurance is also an **Insured** under a nuclear energy liability insurance issued by Nuclear Energy Liability Insurance Association, Mutual Atomic Energy Liability Underwriters or Nuclear Insurance Association of Canada or would be an **Insured** under

any such insurance but for its termination upon exhaustion of its limits of liability; or

2.    resulting from the hazardous properties of nuclear material and with respect to which (i) any person or organization is required to maintain financial protection pursuant to the Atomic Energy Act of 1954, or any law amendatory thereof, or (ii) the **Insured** is, or had this insurance not been issued would be, entitled to indemnity from the United States of America, or any agency thereof under any agreement entered into by the United States of America, or any agency thereof, with any person or organization.

B.    Under any Supplementary Payments Provision relating to immediate medical or surgical relief, to expenses incurred with respect to **Bodily Injury**, sickness, disease or death resulting from the hazardous properties of nuclear material and arising out of the operation of a nuclear facility by any person or organization.

C.    To injury, sickness, disease, death or destruction resulting from the hazardous properties of nuclear material, if

(1)    the nuclear material (i) is at any nuclear facility owned by, or operated by or on behalf of, an **Insured** or (ii) has been discharged or dispersed there from;

(2)    the nuclear material is contained in spent fuel or waste at any time possessed, handled, used, processed, stored, transported or disposed of by or on behalf of an **Insured**; or

(3)    the injury, sickness, disease, death or destruction arises out of the furnishing by an **Insured** of services, materials, parts or equipment in connection with the planning, construction, maintenance, operation or use of any nuclear facility, but if such facility is located within the United States of America, its territories or possessions or Canada, this exclusion (3) applies only to injury to or destruction of property at such nuclear facility.

D.    As used in this Section: "hazardous properties" include radioactive, toxic or explosive properties; "nuclear material" means source material, special nuclear material or by-product material; "source material", "special nuclear material" and "by-product material" have the meanings given them in the Atomic Energy Act of 1954 or in any law amendatory thereof, "spent fuel" means any fuel element or fuel component, solid or liquid, which has been used or exposed to radiation in a nuclear reactor; "waste" means any waste material (i) containing by-product material and (ii) resulting from the operation by any person or organization of any nuclear facility under paragraph (1) or (2) thereof; "nuclear facility" means

1.    any nuclear reactor;

2.    any equipment or device designed or used for (i) separating the isotopes of uranium or plutonium, (ii) processing or utilizing spent fuel, or (iii) handling, processing or packaging waste;

3.    any equipment or device used for the processing, fabricating or alloying of special nuclear material if any time the total amount of such material in the custody of the **Insured** at the premises were such equipment or device is located consists of or contains more than 25 grams of plutonium or uranium 233 of any combination thereof, or more than 250 grams of uranium 235; or

4.    any structure, basin, excavation, premises or place prepared or used for the storage or disposal of waste;

and includes the site on which any of the foregoing is located, all operations conducted on such site and all premises used for such operations; "nuclear reactor" means any

apparatus designed or used to sustain nuclear fission in self-supporting chain reaction or to contain a critical mass of fissionable material.  With respect to injury to or destruction of property, the word "injury" or "destruction" includes all forms or radioactive contamination of property.

It is understood and agreed that, except as specifically provided in the foregoing to the contrary, this Section is subject to the terms, exclusions, conditions and limitations of the insurance to which it is attached.

## XXV.   SERVICE OF SUIT

A.   It is agreed that in the event of the failure of the Underwriters hereon to pay any amount claimed to be due under this insurance, the Underwriters hereon, at the request of the **Named Insured**, will submit to the jurisdiction of a court of competent jurisdiction within the United States.  This Condition does not constitute and should not be understood to constitute an agreement by the Underwriters that an action is properly maintained in a specific forum, nor may it be construed as a waiver of the Underwriters' rights to commence an action in a court of competent jurisdiction in the United States, to remove an action to a United States District Court, or to seek a transfer of a case to another court as permitted by the laws of the United States or of any state of the United States, all of which rights the Underwriters expressly reserve.  It is further agreed that service of process in such suit may be made upon the designated entity in Item 7 of the Declarations, and that in any suit instituted against any one of them upon this policy, the Underwriters will abide by the final decision of such court in the event of an appeal.

B.   The Entity designated in Item 7 of the Declarations is authorized and directed to accept service of process on behalf of the Underwriters in any such suit and/or upon the request of the **Named Insured** to give written undertaking to the **Named Insured** that they will enter a general appearance upon Underwriters' behalf in the event such a suit shall be instituted. Further, pursuant to any statute of any state, territory or district of the United States which makes provision therefore, the Underwriters hereon hereby designate the Superintendent, Commissioner or Director of Insurance or other officer specified for that purpose in the statute or his successor or successors in office, as his or her true and lawful attorney upon whom may be served any lawful process in any action, suit or proceedings instituted by or on behalf of the **Named Insured** or any beneficiary hereunder arising out of this policy, and hereby designates the Entity, designated in Item 7 of the Declarations, as the person to whom the said officer is authorized to mail such process or a true copy thereof.

## XXVI.  CHOICE OF LAW

This insurance shall be governed and construed in accordance with the laws of New York

## XXVII.  SEVERAL LIABILITY

The liability of the insurer under this policy is several and not joint with other insurers party to this policy. An insurer is liable only for the proportion of liability it has underwritten. An insurer is not jointly liable for the proportion of liability underwritten by any other insurer. Nor is an insurer otherwise responsible for any liability of any other insurer that may underwrite this policy.

The proportion of liability under this policy underwritten by an insurer (or, in the case of a Lloyd's syndicate, the total of the proportions underwritten by all the members of the syndicate taken together) is shown next to its stamp. This is subject always to the provision concerning "signing" below.

In the case of a Lloyd's syndicate, each member of the syndicate (rather than the syndicate itself) is an insurer. Each member has underwritten a proportion of the total shown for the syndicate (that total itself being the total of the proportions underwritten by all the members of the syndicate taken together). The liability of each member of the syndicate is several and not joint with other members. A member is liable only for that member's proportion. A member is

not jointly liable for any other member's proportion. Nor is any member otherwise responsible for any liability of any other insurer that may underwrite this policy. The business address of each member is Lloyd's, One Lime Street, London EC3M 7HA. The identity of each member of a Lloyd's syndicate and their respective proportion may be obtained by writing to Market Services, Lloyd's, at the above address.

**Proportion of liability**

Unless there is "signing" (see below), the proportion of liability under this policy underwritten by each insurer (or, in the case of a Lloyd's syndicate, the total of the proportions underwritten by all the members of the syndicate taken together) is shown next to its stamp and is referred to as its "written line".

Where this policy permits, written lines, or certain written lines, may be adjusted ("signed"). In that case a schedule is to be appended to this policy to show the definitive proportion of liability under this policy underwritten by each insurer (or, in the case of a Lloyd's syndicate, the total of the proportions underwritten by all the members of the syndicate taken together). A definitive proportion (or, in the case of a Lloyd's syndicate, the total of the proportions underwritten by all the members of a Lloyd's syndicate taken together) is referred to as a "signed line". The signed lines shown in the schedule will prevail over the written lines unless a proven error in calculation has occurred.

Although reference is made at various points in this clause to "this policy" in the singular, where the circumstances so require this should be read as a reference to contracts in the plural.

## XXVIII. INSPECTION AND AUDIT

The Underwriters shall have the right and opportunity, whenever the Underwriters so desire, to inspect at any reasonable time the **Insured's product**s, goods, operations and premises, but Underwriters assume no responsibility or duty by reason of such inspection or the omission thereof. The **Insured** agrees to provide appropriate personnel to assist the Underwriters during such inspection without cost to the Underwriters.

## XXIX. WARRANTIES, LICENSURE AND ALTERATIONS OF THE NAMED INSURED'S PRODUCTS

A. The premium charged for this **Policy** is based on the **Named Insured's Products** specified in Item 10 of the Declarations**,** operations and premises identified in the underwriting information submitted to Underwriters on behalf of the **Insured** at the Inception Date or subsequently endorsed herein.  The **Insured** shall report promptly to the Underwriters any changes in the **Named Insured's Products,** operations or premises that are likely to impact adversely upon the risks hereby insured, and the Underwriters shall have the right to adjust the premium, Retention(s) and any Policy terms to account for such changes, based on their sole assessment of the additional exposure(s) presented.

Changes to report include:

1. any changes to manufacturing or servicing premises requiring structural alterations, or the acquisition of additional manufacturing or serving premises;

2. any change in manufacturing or serving operations which is likely to result in an annual increase in the **Named Insured's** total **Gross Receipts** of twenty-five percent (25%) or more;

3. any change in the operations or policies of the **Named Insured** that might in the Underwriters' opinion impact materially and adversely upon its risk profile;

4. any material amendments to any system of risk management or loss reduction, or to any supervision, controls or checks declared to the Underwriters;

5.      any changes in operations.

B.  This Policy shall apply to only the **Named Insured's Products** specified in Item 10 of the Declarations, operations and premises.  It is a condition of the coverage afforded under the Policy that the facilities of the **Named Insured** and any **Insured** requiring a license to practice shall be licensed in accordance with all relevant federal, state and local requirements. The **Named Insured** warrants that as of the inception date of this Policy it has secured all relevant licenses.

C.  If, during the **Policy Period**, any **Insured's** licensure status is altered by withdrawal, revocation, denial, suspension or failure to renew, the **Named Insured** shall give written notice of such change to Underwriters' Representative within thirty days of the change becoming effective. Following receipt of such notice, Underwriters may elect, at their sole option, to revise any Insuring Agreements. Definitions, Exclusions, Endorsements or other conditions of this Policy with respect to the **Insured**, with effect from such date of such withdrawal, revocation, denial, suspension or failure to renew. Such action does not waive the Underwriters' option to invoke the provisions of Section XX of this Policy. Furthermore, the Underwriters' will have no obligation to respond to any **Claim** and/or **Accidents,** acts, errors, omissions, **Security Breaches** or violations which took place subsequent to the date of withdrawal, revocation, denial, suspension or failure to renew.

D.  It is a condition precedent to coverage that if the **Insured** is a manufacturer of any product, they will, during the course of this Policy, maintain a formal and complete quality control process in effect for those manufactured products. The quality control process shall assure that the **Named Insured's Products** meet industry standards for safety and efficacy and that all batches, runs, and or lots of goods manufactured, sold, or in any way distributed by the **Named Insured** are consistent with ingredient labelling.

Should any batch, run or lot of goods manufactured, sold or in any way distributed by any **Insured** be deemed unsafe, inefficacious, contaminated or in anyway inconsistent with ingredient labelling, the **Insured** will at their own expense immediately take all precautions and necessary steps to prohibit entry into the steam of commerce or withdraw same from the market.

Failure to comply with this Section shall void any and all coverage available to the **Insured.** The Underwriters shall have no duty to defend or respond to any **Claim** arising from the activities of the **Insured** if the **Insured** does not maintain the above described quality control process.

## XXX.   NON CUMULATION OF LIMITS

This Policy may be one of several policies issued by the Underwriters to the **Named Insured** and its subsidiary companies. It is agreed that any **Claim** or suit which could be covered under two or more of these policies will be covered under only the policy with the highest limit of insurance available or, if the limits are the same, under only one of the policies.

## XXXI.   SANCTIONS LIMITATION AND EXCLUSION

No Underwriter shall be deemed to provide cover and no Underwriter shall be liable to pay any **Claim** or provide any benefit hereunder to the extent that the provision of such cover, payment of such **Claim** or provision of such benefit would expose the Underwriters to any sanction, prohibition or restriction under United Nations resolutions or the trade or economic sanctions, law or regulations of the European Union, United Kingdom or United States of America.

## XXXII.   PREMIUM AUDIT CLAUSE

Upon expiration of the Policy, the **Insured** shall agree to submit requested documents to the Underwriters, in the form of a self audit that comprise a statement of the **Insured's** actual total premium base as specified herein for the **Policy Period**; and/or, the I**nsured** shall agree to accommodate and cooperate with a physical audit of the **Insured's** actual total premium base as specified herein for the **Policy Period**.

The Underwriters have an unconditional right to charge an additional premium as stated in the Declarations.

Self and/or physical audit will be determined and requested by the Underwriters and the **Insured** shall accommodate and complete a self and/or physical audit within twenty-one (21) days after request.  The rendering of any estimate or the making of any previous settlement shall not bar the examination herein provided for, nor the Underwriters' right to additional premium.

Underwriters may examine and perform a physical audit of the **Insured's** books and records at any time as far as they relate to the subject matter of this endorsement.  If the Underwriters request a physical audit, the fees and costs of the first such physical audit will be arranged for and paid by the Underwriters.

Underwriters will notify the **Insured** of any additional premium to be paid by the mailing of written notice to the Named Insured at the address shown in the Declarations.  The mailing of notice as aforesaid shall be sufficient proof of notice. The **Insured** agrees to pay any additional premium within thirty (30) days after notification by Underwriters.

Underwriters reserve the right to waive the payment by the Named Insured of any additional premium.

Underwriters reserve the right to cancel any policy currently in force with ten (10) days notice as per Section XX, if any audits or additional premiums are not paid.

**PREMIUM PAYMENT WARRANTY**

IT IS HEREBY WARRANTED that all premium due to Underwriters under this policy is paid within 45 days from inception.

Non-receipt by Underwriters of such premium, by midnight (local standard time) on the premium due date, shall render this policy void with effect from Inception.

623AFB00082

**NUCLEAR INCIDENT EXCLUSION CLAUSE-LIABILITY-DIRECT (BROAD) (U.S.A.)**

For attachment to insurances of the following classifications in the U.S.A., its Territories and Possessions, Puerto Rico and the Canal Zone:

Owners, Landlords and Tenants Liability, Contractual Liability, Elevator Liability, Owners or Contractors (including railroad) Protective Liability, Manufacturers and Contractors Liability, Product Liability, Professional and Malpractice Liability, Storekeepers Liability, Garage Liability, Automobile Liability (including Massachusetts Motor Vehicle or Garage Liability),

not being insurances of the classifications to which the Nuclear Incident Exclusion Clause-Liability-Direct (Limited) applies.

This Policy* does not apply:

I.      Under any Liability Coverage, to injury, sickness, disease, death or destruction:

(a)      with respect to which an insured under the Policy is also an insured under a nuclear energy liability policy issued by Nuclear Energy Liability Insurance Association, Mutual Atomic Energy Liability Underwriters or Nuclear Insurance Association of Canada, or would be an insured under any such policy but for its termination upon exhaustion of its limit of liability; or

(b)      resulting from the hazardous properties of nuclear material and with respect to which (1) any person or organization is required to maintain financial protection pursuant to the Atomic Energy Act of 1954, or any law amendatory thereof, or (2) the insured is, or had this Policy not been issued would be, entitled to indemnity from the United States of America, or any agency thereof, under any agreement entered into by the United States of America, or any agency thereof, with any person or organization.

II.     Under any Medical Payments Coverage, or under any Supplementary Payments Provision relating to immediate medical or surgical relief, to expenses incurred with respect to bodily injury, sickness, disease or death resulting from the hazardous properties of nuclear material and arising out of the operation of a nuclear facility by any person or organization.

III.    Under any Liability Coverage, to injury, sickness, disease, death or destruction resulting from the hazardous properties of nuclear material, if:

(a)      the nuclear material (1) is at any nuclear facility owned by, or operated by or on behalf of, an insured or (2) has been discharged or dispersed therefrom;

(b)      the nuclear material is contained in spent fuel or waste at any time possessed, handled, used, processed, stored, transported or disposed of by or on behalf of an insured; or

(c)      the injury, sickness, disease, death or destruction arises out of the furnishing by an insured of services, materials, parts or equipment in connection with the planning, construction, maintenance, operation or use of any nuclear facility, but if such facility is located within the United States of America, its territories or possessions or Canada, this exclusion (c) applies only to injury to or destruction of property at such nuclear facility.

IV.     As used in this endorsement:

"hazardous properties" include radioactive, toxic or explosive properties; "nuclear material" means source material, special nuclear material or by-product material; "source material", "special nuclear material", and "by-product material" have the meanings given them in the Atomic Energy Act 1954 or in any law amendatory thereof; "spent fuel" means any fuel element or fuel component, solid or liquid, which has been used or exposed to

radiation in a nuclear reactor; "waste" means any waste material (1) containing by-product material and (2) resulting from the operation by any person or organization of any nuclear facility included within the definition of nuclear facility under paragraph (a) or (b) thereof; "nuclear facility" means:

    (a)      any nuclear reactor,

    (b)      any equipment or device designed or used for (1) separating the isotopes of uranium or plutonium, (2) processing or utilizing spent fuel, or (3) handling, processing or packaging waste,

    (c)      any equipment or device used for the processing, fabricating or alloying of special nuclear material if at any time the total amount of such material in the custody of the insured at the premises where such equipment or device is located consists of or contains more than 25 grams of plutonium or uranium 233 or any combination thereof, or more than 250 grams of uranium 235,

    (d)      any structure, basin, excavation, premises or place prepared or used for the storage or disposal of waste,

and includes the site on which any of the foregoing is located, all operations conducted on such site and all premises used for such operations; "nuclear reactor" means any apparatus designed or used to sustain nuclear fission in a self-supporting chain reaction or to contain a critical mass of fissionable material.  With respect to injury to or destruction of property, the word "injury" or "destruction" includes all forms of radioactive contamination of property.

It is understood and agreed that, except as specifically provided in the foregoing to the contrary, this clause is subject to the terms, exclusions, conditions and limitations of the Policy to which it is attached.

* NOTE: As respects policies which afford liability coverages and other forms of coverage in addition, the words underlined should be amended to designate the liability coverage to which this clause is to apply.

17/3/60
NMA1256

**RADIOACTIVE CONTAMINATION EXCLUSION CLAUSE-LIABILITY-DIRECT (U.S.A.)**

For attachment (in addition to the appropriate Nuclear Incident Exclusion Clause-Liability-Direct) to liability insurances affording worldwide coverage.

In relation to liability arising outside the U.S.A., its Territories or Possessions, Puerto Rico or the Canal Zone, this Policy does not cover any liability of whatsoever nature directly or indirectly caused by or contributed to by or arising from ionising radiations or contamination by radioactivity from any nuclear fuel or from any nuclear waste from the combustion of nuclear fuel.

13/2/64
NMA1477

**SANCTION LIMITATION AND EXCLUSION CLAUSE**

No (re)insurer shall be deemed to provide cover and no (re)insurer shall be liable to pay any claim or provide any benefit hereunder to the extent that the provision of such cover, payment of such claim or provision of such benefit would expose that (re)insurer to any sanction, prohibition or restriction under United Nations resolutions or the trade or economic sanctions, laws or regulations of the European Union, United Kingdom or United States of America.

LMA3100
15 September 2010

## WAR AND TERRORISM EXCLUSION ENDORSEMENT

Notwithstanding any provision to the contrary within this insurance or any endorsement thereto it is agreed that this insurance excludes loss, damage, cost or expense of whatsoever nature directly or indirectly caused by, resulting from or in connection with any of the following regardless of any other cause or event contributing concurrently or in any other sequence to the loss;

1.      war, invasion, acts of foreign enemies, hostilities or warlike operations (whether war be declared or not), civil war, rebellion, revolution, insurrection, civil commotion assuming the proportions of or amounting to an uprising, military or usurped power; or

2.      any act of terrorism.

For the purpose of this endorsement an act of terrorism means an act, including but not limited to the use of force or violence and/or the threat thereof, of any person or group(s) of persons, whether acting alone or on behalf of or in connection with any organisation(s) or government(s), committed for political, religious, ideological or similar purposes including the intention to influence any government and/or to put the public, or any section of the public, in fear.

This endorsement also excludes loss, damage, cost or expense of whatsoever nature directly or indirectly caused by, resulting from or in connection with any action taken in controlling, preventing, suppressing or in any way relating to 1 and/or 2 above.

If the Underwriters allege that by reason of this exclusion, any loss, damage, cost or expense is not covered by this insurance the burden of proving the contrary shall be upon the Assured.

In the event any portion of this endorsement is found to be invalid or unenforceable, the remainder shall remain in full force and effect.

08/10/01
NMA2918

**SMALL ADDITIONAL OR RETURN PREMIUMS CLAUSE (U.S.A.)**

NOTWITHSTANDING anything to the contrary contained herein and in consideration of the premium for which this Insurance is written, it is understood and agreed that whenever an additional or return premium of $2 or less becomes due from or to the Assured on account of the adjustment of a deposit premium, or of an alteration in coverage or rate during the term or for any other reason, the collection of such premium from the Assured will be waived or the return of such premium to the Assured will not be made, as the case may be.

NMA1168

**BEAZLEY COMPLAINTS NOTICE**

If you have any questions or concerns about your policy or the handling of a claim you should, in the first instance, contact your insurance broker.

In the event that you remain dissatisfied and wish to make a complaint, it may be possible for you to refer the matter to the Complaints team at Lloyd's. Their address is:

Complaints
One Lime Street
London EC3M 7HA
Tel No: 020 7327 5693
Fax No: 020 7327 5225
E-mail: complaints@lloyds.com

Alternatively you can contact the insurer, Beazley, directly in the US at US.Complaints@beazley.com or your local regulatory authority.

**U.S. TERRORISM RISK INSURANCE ACT OF 2002 AS AMENDED
NOT PURCHASED CLAUSE**

*This Clause is issued in accordance with the terms and conditions of the "U.S. Terrorism Risk Insurance Act of 2002" as amended as summarized in the disclosure notice.*

It is hereby noted that the Underwriters have made available coverage for "insured losses" directly resulting from an "act of terrorism" as defined in the "U.S. Terrorism Risk Insurance Act of 2002", as amended ("TRIA") and the Insured has declined or not confirmed to purchase this coverage.

This Insurance therefore affords no coverage for losses directly resulting from any "act of terrorism" as defined in TRIA except to the extent, if any, otherwise provided by this policy.

All other terms, conditions, insured coverage and exclusions of this Insurance including applicable limits and deductibles remain unchanged and apply in full force and effect to the coverage provided by this Insurance.

LMA5390
09 January 2020

**DATA PROTECTION SHORT FORM INFORMATION NOTICE (LAYER 1)**

**Your personal information notice**

*Who we are*
We are the Lloyd's underwriter(s) identified in the contract of insurance and/or in the certificate of insurance.

*The basics*
We collect and use relevant information about you to provide you with your insurance cover or the insurance cover that benefits you and to meet our legal obligations.

This information includes details such as your name, address and contact details and any other information that we collect about you in connection with the insurance cover from which you benefit. This information may include more sensitive details such as information about your health and any criminal convictions you may have.

In certain circumstances, we may need your consent to process certain categories of information about you (including sensitive details such as information about your health and any criminal convictions you may have). Where we need your consent, we will ask you for it separately. You do not have to give your consent and you may withdraw your consent at any time. However, if you do not give your consent, or you withdraw your consent, this may affect our ability to provide the insurance cover from which you benefit and may prevent us from providing cover for you or handling your claims.

The way insurance works means that your information may be shared with, and used by, a number of third parties in the insurance sector for example, insurers, agents or brokers, reinsurers, loss adjusters, sub-contractors, regulators, law enforcement agencies, fraud and crime prevention and detection agencies and compulsory insurance databases. We will only disclose your personal information in connection with the insurance cover that we provide and to the extent required or permitted by law.

*Other people's details you provide to us*
Where you provide us or your agent or broker with details about other people, you must provide this notice to them.

*Want more details?*
For more information about how we use your personal information please see our full privacy notice(s), which is/are available online on our website(s) or in other formats on request.

*Contacting us and your rights*
You have rights in relation to the information we hold about you, including the right to access your information. If you wish to exercise your rights, discuss how we use your information or request a copy of our full privacy notice(s), please contact us, or the agent or broker that arranged your insurance who will provide you with our contact details at:

Thompson Heath & Bond Ltd
107 Leadenhall Street
London EC3A 4AF

LMA9151

25 April 2018

# Exhibit B

PATRICK R. CAMPBELL (SBN 275978)
CAMPBELL LAW GROUP, P.C.
140 W H Street
Benicia, CA 94510-3280
Tel: (707) 771-9110
Fax: (707) 450-1191
Email: patrick@attorneyprc.com

FILED/ENDORSED
Clerk of the Superior Court

MAR 09 2021

By _____
R. PULIDO
DEPUTY CLERK

Attorneys for Plaintiff
JERRY HILD

### IN THE SUPERIOR COURT OF THE STATE OF CALIFORNIA

#### FOR THE COUNTY OF SOLANO
#### UNLIMITED JURISDICTION

| | |
|---|---|
| JERRY HILD, an individual; | Case No. FCS 056179 |
| Plaintiff | COMPLAINT FOR DAMAGES |
| v. | JURY TRIAL REQUESTED |
| AMAZON.COM SERVICES, A Limited Liability Company doing business as AMAZON.COM; OXGORD, INCORPORATED, A California corporation; GIMBEL BROTHERS; GIMBEL BROTHERS doing business as MALIBU EXPRESS; and Does 1 through 40, inclusive, | ASSIGNED TO JUDGE CHRISTINE CARRINGER FOR ALL PURPOSES |
| Defendants. | |

COMES NOW, Plaintiff JERRY HILD, and alleges as follows:

### GENERAL ALLEGATIONS

1.      At all times herein alleged, plaintiff JERRY HILD (hereinafter "Plaintiff") was and is a resident of the County of Solano, State of California.  Plaintiff is the owner of an OxGord Dual Height Aluminum Folding Ladder, 330 lb., capacity, which was purchased online from Amazon.com.

2.  Plaintiff is informed and believes and based thereon alleges that at all times herein alleged, defendant AMAZON.COM SERVICES, LLC is a limited liability company organized and existing under the laws of the State of Delaware and doing business as AMAZON.COM.

1  Plaintiff is further informed and believe that defendant AMAZON.COM is a multinational

2  company based in Seattle, Washington and operates an online marketplace where it advertises,

3  sells and distributes either itself or through third-party vendors a vast array of consumer goods.

4      3.  Plaintiff is informed and believes and based thereon alleges that at all times herein

5  alleged, defendant OXGORD, INCORPORATED is a corporation organized and existing under

6  the laws of the State of California and having its principal place of business in Gardena,

7  California. Plaintiff is further informed and believes that OXGORD, INCORPORATED

8  manufactures, packages and distributes a folding ladder known as the "OxGord Dual Height

9  Aluminum Folding Ladder, 330 lb., capacity."

10     4.  Plaintiff is informed and believes and based thereon alleges that defendant GIMBEL

11  BROTHERS, is an entity the form of which is presently unknown; GIMBEL BROTHERS doing

12  business as MALIBU EXPRESS, an entity the form of which is presently unknown and having its

13  principal place of business in Denver, Colorado. Plaintiff is informed and believes that GIMBEL

14  BROTHERS, unknown entity, GIMBEL BROTHERS doing business as MALIBU EXPRESS,

15  unknown entity, advertised, marketed, distributed and/or sold that certain ladder known as the

16  "OxGord Dual Height Aluminum Folding Ladder," which was advertised and claimed as having a

17  330 lb capacity and which GIMBEL BROTHERS, unknown entity, GIMBEL BROTHERS doing

18  business as MALIBU EXPRESS, unknown entity, sold, inter alia, in the State of California.

19     5.  The incident herein alleged, occurred in the County of Solano, California, and plaintiff

20  suffered damages in the City of Benicia, County of Solano, which is the proper venue for this

21  action.

22     6.  The true names or capacities, whether individual, associate, corporate, or otherwise of

23  Defendants charged in this Complaint as Does 1 through 40, inclusive, and each of them, are

24  unknown to the Plaintiffs, who therefore sue said Defendants by such fictitious names.  As soon as

25  their respective true names and capacities have been ascertained, Plaintiffs will amend this

26  Complaint to show the same.

27     7.  Plaintiff is informed and believes, and on that basis allege, that each of said fictitiously

28  named Defendants is responsible in some manner for the occurrences herein alleged and the

1  Plaintiffs' injuries herein alleged were proximately caused by each of said Defendants' acts or

2  omissions.

3      8.  Plaintiff is further informed and believes, and on that basis alleges, that at all times

4  herein mentioned, each of the Defendants was the agent or the employee of each of the other

5  Defendants and was acting within the course and scope of such agency or employment in acting or

6  failing to act as hereinafter set forth.

7      9.  Plaintiff is informed and believes, and on that basis alleges, that at all times herein

8  mentioned, defendants OXGORD, INCORPORATED and Does 1 - 10, inclusive, were

9  manufacturers who were engaged in manufacturing and packaging the OxGord Dual Height

10 Aluminum Folding Ladder which purported to have a capacity of 330 lbs.

11     10.  Plaintiff is informed and believes, and on that basis alleges, that at all times herein

12 mentioned, defendants GIMBEL BROTHERS, unknown entity, GIMBEL BROTHERS doing

13 business as MALIBU EXPRESS, unknown entity, and Does 10 - 20, inclusive, were, and at all

14 times herein mentioned was engaged in the business of distributing, supplying, and selling at

15 wholesale or retail, the OxGord Dual Height Aluminum Folding Ladder for use by members of the

16 general public.

17     11.  Plaintiff is informed and believes, and on that basis alleges, that at all times herein

18 mentioned, defendants AMAZON.COM SERVICES, LLC doing business as AMAZON.COM and

19 Does 20 - 30, inclusive, provided the online platform which advertised and sold the OxGord Dual

20 Height Aluminum Folding Ladder claimed as having a capacity of 330 lbs., and from which

21 Plaintiff purchased the aforesaid ladder and through which payment was made.

22 **FIRST CAUSE OF ACTION**

23 **Strict Liability in Tort - by Consumer Against Manufacturer,**
**Wholesaler and Retailer**

24

25 **(Against All Defendants)**

26     12.  Plaintiff repeats, realleges, and incorporates herein by this reference, all of the

27 allegations set forth in paragraphs 1 - 11, inclusive of this Complaint, as though fully set forth

28 herein.

13.  On or about December 7, 2019, Plaintiff and his companion purchased the OxGord Dual Height Aluminum Folding Ladder advertised as having a capacity of 330 lbs., so that they could do some improvements to the exterior of their home located at 165 Carlisle Way in Benicia, County of Solano, State of California.

14.  Plaintiff used the ladder once, prior to the date of the incident herein alleged.  Plaintiff has used folding ladders in the past and is familiar with the set-up and use, inter alia, of such ladders. Plaintiff dutifully followed all of the instructions that were provided with the ladder.  On the second occasion, on June 22, 2020, Plaintiff used the folding ladder in the manner and for the purpose as intended for such product, by defendants, and each of them.

15.  Defendants, and each of them, knew that the product manufactured by defendants OXGORD, INCORPORATED and Does 1 - 10, inclusive, sold/distributed by Defendant GIMBEL BROTHERS, unknown entity, GIMBEL BROTHERS doing business as MALIBU EXPRESS, unknown entity, and Does 10 - 20, inclusive, on the online platform which advertised and sold the product, namely Defendant AMAZON.COM and Does 20 - 30, would be purchased from defendants and used by members of the general public, such as plaintiff, without inspection for defects by such members of the general public.

16.  Plaintiff is informed and believes and based thereon alleges that at the time of the purchase of the OxGord Dual Height Aluminum Folding Ladder advertised as having a capacity of 330 lbs., the ladder was defective and unsafe for its intended purpose.  On June 22, 2020, plaintiff was using the ladder and was approximately 6 feet above the ground.  Without warning, the ladder suddenly collapsed causing the Plaintiff to fall to the ground from a height of 6 feet. Plaintiff is informed and believes that the frame of the ladder was defective and not capable of bearing the 330 lb. weight capacity that had been advertised.  The construction of the ladder was flimsy, the ladder was unstable, and there was no warning that it could simply buckle under the weight of the user.

17. As a proximate result of the defective and unsafe condition of the product as manufactured by defendants OXGORD INCORPORATED and Does 1 - 10, inclusive, and as advertised, sold and distributed by defendants GIMBEL BROTHERS, unknown entity, GIMBEL

BROTHERS doing business as MALIBU EXPRESS, unknown entity, AMAZON.COM and Does 10- 30, inclusive, and failure to warn users of the unsafe condition of the ladder, Plaintiff was seriously hurt and injured.  Plaintiff had to be rushed to the Emergency Department at Kaiser Permanente in Vallejo by Medic Ambulance.  Plaintiff suffered traumatic injury to his head and had to receive staples in his head.  Plaintiff also sustained injuries to his elbow. Plaintiff sustained bodily injuries, and shock and injury to his nervous system, all of which have caused, now cause, and will continue to cause him great physical and mental pain and suffering.  Plaintiff has been unable to perform his usual functions based upon his injuries and suffers from dizziness, confusion and headaches and pain in his elbow.

18. As a further proximate result of the defective, dangerous, and unsafe condition of the product, plaintiff sustained injuries consisting of trauma to his brain and injuries to his elbow, all of which have caused, now cause, and will continue to cause him great physical and mental pain and suffering and emotional distress.

19. As a further proximate result of the defective and unsafe condition of the product, plaintiff was, now is, and in the future will be, required to obtain and to incur expense for the services of physicians to examine, diagnose, prescribe, treat, and care for him, and incidental expenses, all to his/her damage.

WHEREFORE, Plaintiff prays for judgment as hereinafter set forth.

## SECOND CAUSE OF ACTION

### Negligence

### (Against All Defendants)

20.   Plaintiff repeats, realleges, and incorporates herein by this reference, all of the allegations set forth in paragraphs 1 - 19, inclusive of this Complaint, as though fully set forth herein.

21.   On or about December 7, 2019, Plaintiff and his companion purchased the OxGord Dual Height Aluminum Folding Ladder advertised as having a capacity of 330 lbs., so that they could do some improvements to the exterior of their home located at 165 Carlisle Way in Benicia, County of Solano, State of California.

22.  Plaintiff is informed and believes and based thereon alleges that defendants OXGORD, INCORPORATED and Does 1 - 10, inclusive, manufactured and packaged the folding ladder; that Defendants GIMBEL BROTHERS, unknown entity, GIMBEL BROTHERS doing business as MALIBU EXPRESS, unknown entity, and Does 10 - 20, inclusive, advertised, sold/distributed the ladder on the online platform maintained by Defendant AMAZON.COM and Does 20 - 30, where the ladder was advertised as having a capacity of 330 lbs.

23. At all times herein mentioned, defendants, and each of them, knew, or in the exercise of reasonable care should have known, that the OxGord Dual Height Aluminum Folding Ladder advertised as having a capacity of 330 lbs., was of such a nature that if it was not properly manufactured, compounded, tested, inspected, packaged, labeled, distributed, advertised and marketed for the use and purpose for which it was intended, it was unsafe and likely to injure the person by whom it was used.

24. Defendants Manufacturers/packagers OXGORD INCORPORATED and Does 1 - 10, inclusive, defendant seller/distributor/advertiser GIMBEL BROTHERS, unknown entity, GIMBEL BROTHERS doing business as MALIBU EXPRESS, unknown entity, and Does 10 - 20, inclusive, and Defendants AMAZON.COM advertiser and seller of the folding ladder, so negligently manufactured, tested or failed to test, inspected or failed to inspect, packaged, labeled, distributed, advertised, sold and recommended the use of the ladder, that the product was defective and unsafe for the use and purpose for which it was intended when used and applied as recommended by defendants, and each of them.

25. The defective, and/or dangerous character of the product and its unsafety for the use and purpose for which it was intended when used and applied as recommended by defendants, and each of them, was known to defendants, and each of them, or in the exercise of reasonable care should have been known or discovered by them, but was not disclosed nor made known to plaintiff and warnings relating to the tendency of the ladder to buckle, collapse and break, was not made known to the plaintiff.  Rather the folding ladder was advertised as having the capacity to bear weight of 330 lbs.

26.  On June 20, 2020, while plaintiff was using the ladder and was about 6 feet above

COMPLAINT FOR DAMAGES

ground level, the ladder suddenly collapsed causing Plaintiff to fall to the ground. Contrary to the representations, the ladder could not bear weight of 330 lbs. and collapsed as plaintiff was using it.

27. As a proximate result of the defective and unsafe condition of the product as manufactured by defendants OXGORD INCORPORATED and Does 1 - 10, inclusive, and as sold and distributed by defendants GIMBEL BROTHERS, unknown entity, GIMBEL BROTHERS doing business as MALIBU EXPRESS, unknown entity, AMAZON.COM and Does 10- 30, inclusive, and negligent failure to warn of the dangerous nature of the ladder, Plaintiff was seriously hurt and injured. Plaintiff had to be rushed to the Emergency Department at Kaiser Permanente in Vallejo by Medic Ambulance. Plaintiff suffered traumatic injury to his head and had to receive staples in his head. Plaintiff also sustained injuries to his elbow. Plaintiff sustained bodily injuries, and shock and injury to his nervous system, all of which have caused, now cause, and will continue to cause him great physical and mental pain and suffering. Plaintiff has been unable to perform his usual functions based upon his injuries and suffers from dizziness, confusion and headaches and pain in his elbow.

28. As a further proximate result of the defective, dangerous, and unsafe condition of the product, plaintiff sustained injuries consisting of trauma to his brain and injuries to his elbow, all of which have caused, now cause, and will continue to cause him great physical and mental pain and suffering and emotional distress.

29. As a further proximate result of the defective and unsafe condition of the product, plaintiff was, now is, and in the future will be, required to obtain and to incur expense for the services of physicians to examine, diagnose, prescribe, treat, and care for him, and incidental expenses, all to his/her damage.

WHEREFORE, Plaintiff prays for judgment as hereinafter set forth.

<u>**THIRD CAUSE OF ACTION**</u>

<u>**Breach of Implied Warranty**</u>

**Against Defendants OXGORD, INC., GIMBEL BROTHERS, INC.,
and Does 1 - 20, inclusive**

30. Plaintiff repeats, realleges, and incorporates herein by this reference, all of the allegations set forth in paragraphs 1 - 29, inclusive of this Complaint, as though fully set forth

herein.

31.   Plaintiff is informed and believes, and on that basis alleges, that at all times herein mentioned, defendants OXGORD, INC., GIMBEL BROTHERS, unknown entity, GIMBEL BROTHERS doing business as MALIBU EXPRESS, unknown entity, and Does 1 - 20, inclusive, were in the business of manufacturing, packaging distributing and selling a folding ladder known as the "OxGord Dual Height Aluminum Folding Ladder, 330 lb., capacity."

32.  Plaintiff is informed and believes, and on that basis alleges, that at all times herein mentioned, defendants, and each of them sold the "OxGord Dual Height Aluminum Folding Ladder, 330 lb., capacity," and recommended its sale and use by to members of the general public.

33.   On or about December 7, 2019, Plaintiff and his companion purchased the OxGord Dual Height Aluminum Folding Ladder advertised as having a capacity of 330 lbs., so that they could do some improvements to the exterior of their home located at 165 Carlisle Way in Benicia, County of Solano, State of California.

34.  Plaintiff is experienced in the use of folding ladders and has used them in the past. This specific ladder was advertised as having a weight-bearing capacity of 330 lbs.

35.   On June 20, 2020, while plaintiff was using the ladder and was about 6 feet above ground level, the ladder suddenly collapsed causing Plaintiff to fall to the ground.  Contrary to the representations, the ladder could not bear weight of 330 lbs. and collapsed as plaintiff was using it.

36.  At all times herein mentioned, defendants, and each of them, warranted to the general public and to plaintiff, in particular, that the OxGord Dual Height Aluminum Folding Ladder manufactured by OXGORD, INC., and Does 1 - 10, inclusive, and sold by GIMBEL BROTHERS, unknown entity, GIMBEL BROTHERS doing business as MALIBU EXPRESS, unknown entity, and Does 10 - 20, inclusive, was fit for use and would not collapse under a weight of less than 330 lbs.

37.  Defendants, and each of them, breached their implied warranty when they offered for sale to the general public, and sold to plaintiff in particular, a product advertised as a weight bearing capacity of 330 lbs. and a sturdy frame which would not just collapse, without warning, when it was used in the manner intended.   This rendered the product unfit for its intended use.

Plaintiff had purchased and used the folding ladder in reliance on the implied warranty breached by defendants.

38.  Before the discovery by plaintiff, he did not know about the unsafe condition of the folding ladder, but he reasonably believed it to be safe, for, and it was recommended by the manufacturer and seller as being safe for use.

39. As a proximate result of the defective and unsafe condition of the product as manufactured by defendants OXGORD INCORPORATED and Does 1 - 10, inclusive, and as sold and distributed by defendants GIMBEL BROTHERS, unknown entity, GIMBEL BROTHERS doing business as MALIBU EXPRESS, unknown entity, and Does 10 - 20, inclusive, Plaintiff was seriously hurt and injured.  Plaintiff had to be rushed to the Emergency Department at Kaiser Permanente in Vallejo by Medic Ambulance.  Plaintiff suffered traumatic injury to his head and had to receive staples in his head.  Plaintiff also sustained injuries to his elbow.   Plaintiff sustained bodily injuries, and shock and injury to his nervous system, all of which have caused, now cause, and will continue to cause him great physical and mental pain and suffering.  Plaintiff has been unable to perform his usual functions based upon his injuries and suffers from dizziness, confusion and headaches and pain in his elbow.

40. As a further proximate result of the defective, dangerous, and unsafe condition of the product, plaintiff sustained injuries consisting of trauma to his brain and injuries to his elbow, all of which have caused, now cause, and will continue to cause him great physical and mental pain and suffering and emotional distress.

41. As a further proximate result of the defective and unsafe condition of the product, plaintiff was, now is, and in the future will be, required to obtain and to incur expense for the services of physicians to examine, diagnose, prescribe, treat, and care for him, and incidental expenses, all to his/her damage.

WHEREFORE, Plaintiff prays for judgment as hereinafter set forth.

### FOURTH CAUSE OF ACTION

### False Advertising

### Against All Defendants

COMPLAINT FOR DAMAGES

- 9 -

1   42.   Plaintiff repeats, realleges, and incorporates herein by this reference, all of the

2   allegations set forth in paragraphs 1 - 41, inclusive of this Complaint, as though fully set forth

3   herein.

4   43.   Plaintiff is informed and believes, and on that basis alleges, that at all times herein

5   mentioned, defendants, and each of them, were engaged in the manufacturing, marketing,

6   distributing for sale, selling, and advertising of a OxGord Dual Height Aluminum Folding Ladder,

7   330 lb., capacity.

8   44.   In or about December 2019, defendants, and each of them, represented to the public,

9   including plaintiff and his companion, by means of advertisements published online on the

10   Amazon.com website, that the OxGord Dual Height Aluminum Folding Ladder, was a sturdy

11   ladder with a 330 lb., capacity.

12   45.   Defendants' and each of their representations were untrue and/or made without

13   reasonable cause for believing them to be true, in that the ladder had a flimsy frame and was not

14   capable of a 330 lb. capacity.

15   46.   Defendants, and each of them, made the representations herein alleged with the

16   intention of inducing the public to purchase the OxGord Dual Height Aluminum Folding Ladder,

17   330 lb., capacity manufactured, packaged, distributed and sold by the defendants.

18   47.   On or about December 7, 2019, Plaintiff and his companion were induced to purchase

19   the OxGord Dual Height Aluminum Folding Ladder advertised as having a capacity of 330 lbs., in

20   reliance on the representations that the ladder was sturdy and had a maximum capacity of 330 lbs.

21   48. As a proximate result of defendants' and each of their representations, plaintiff and his

22   companion were induced to purchase defendants' product online, as opposed to other products of a

23   similar nature.

24   49.   At the time defendants made the misrepresentations regarding the folding ladder as

25   herein alleged, defendants had no reasonable grounds for believing the representations to be true.

26   Plaintiff is informed and believes that defendants had, in the past, received complaints about the

27   quality of the ladder and that it was dangerous.

28   50.   On June 22, 2020, Plaintiff used the folding ladder in the manner and for the purpose as

intended for such product by defendants, and each of them.  The ladder was so poorly constructed

and manufactured, that it collapsed, without warning, while Plaintiff as about six feet from the ground,

51. As a proximate result of defendants and each of their misrepresentations, Plaintiff was seriously hurt and injured. Plaintiff had to be rushed to the Emergency Department at Kaiser Permanente in Vallejo by Medic Ambulance. Plaintiff suffered traumatic injury to his head and had to receive staples in his head. Plaintiff also sustained injuries to his elbow. Plaintiff sustained bodily injuries, and shock and injury to his nervous system, all of which have caused, now cause, and will continue to cause him great physical and mental pain and suffering. Plaintiff has been unable to perform his usual functions based upon his injuries and suffers from dizziness, confusion and headaches and pain in his elbow.

52. As a further proximate result defendants' and each of their misrepresentations, plaintiff sustained injuries consisting of trauma to his brain and injuries to his elbow, all of which have caused, now cause, and will continue to cause him great physical and mental pain and suffering and emotional distress.

53. As a further proximate result of defendants' and each of their misrepresentations, plaintiff was, now is, and in the future will be, required to obtain and to incur expense for the services of physicians to examine, diagnose, prescribe, treat, and care for him, and incidental expenses, all to his/her damage.

WHEREFORE, Plaintiff prays for judgment as hereinafter set forth.

### FIFTH CAUSE OF ACTION

### Negligent Infliction of Emotional Distress

### Against All Defendants

54. Plaintiff repeats, realleges and incorporates herein, by this reference, paragraphs 1 through 53, of this Complaint, as though fully set forth.

55. Defendants, and each of them, by their acts of selling a defective product which was advertised, packaged and sold as having the capacity to bear a weight of 330 lbs. resulted in plaintiff using the folding ladder that collapsed while he was standing on it, six feet from the ground. Defendants' actions negligently or recklessly caused severe emotional distress to the plaintiff.

56.   As a direct and proximate result of said conduct of Defendants, and each of them, plaintiff suffered damages in an amount according to proof at trial.

WHEREFORE, Plaintiffs pray judgment as hereinafter set forth.

1.   For general damages, according to proof at the time of trial.

2.   For special damages, according to proof at the time of trial.

3.   For prejudgment interest.

3.   For costs of suit herein incurred; and

4.,   For such other and further relief as the court may deem proper.

DATED:  March 9, 2021            CAMPBELL LAW GROUP, P.C.

By: _____
PATRICK R. CAMPBELL
Attorneys for Plaintiff
JERRY HILD

## REQUEST FOR JURY TRIAL

Plaintiff JERRY HILD respectfully requests a trial by jury.

DATED:  March 9, 2021            CAMPBELL LAW GROUP, P.C.

By: _____
PATRICK R. CAMPBELL
Attorneys for Plaintiff
JERRY HILD

# Exhibit C

**LOWENTHAL & ABRAMS, P.C.**
By:     Edward M. Grant, Esquire
Identification No. 314095
555 City Line Avenue, Suite 500
Bala Cynwyd, Pennsylvania  19004
(610) 667-7511                                         Attorneys for Plaintiffs

---

DOMENICO BUONSANTE and         :   COURT OF COMMON PLEAS
CONCETTA BUONSANTE, h/w        :   LUZERNE COUNTY
24 North Beech Road            :
Plains, PA  18705              :   No. | 2021-09625 |
                               :
        v.                     :   MAJOR JURY
                               :
OXGORD, INC.                   :
16325 S. Avalon Boulevard      :
Gardena, CA 90248              :
    and                        :
GROUPON, INC.                  :
600 W. Chicago Avenue          :
Chicago, IL  60654             :

## COMPLAINT

1.      Plaintiffs, DOMENICO BUONSANTE and CONCETTA BUONSANTE, are

adult individuals who reside at the above-captioned address in Luzerne County, Pennsylvania.

2.      Defendant, OXGORD, INC. (hereinafter "Oxgord"), is a foreign corporation with

its principal place of business located at the above-captioned address and doing business in

Luzerne County in the Commonwealth of Pennsylvania.

3.      At all times relevant, Oxgord has had continuous, substantial and systematic

contacts with the Commonwealth of Pennsylvania and County of Luzerne by delivering and

selling its products to dealers and/or consumers within Luzerne County, Pennsylvania; Oxgord

regularly, systematically and continuously solicits and engages in business in the Commonwealth

of Pennsylvania and County of Luzerne, wherein it derives substantial revenue from selling its

products.

4.      Defendant, GROUPON, INC. (hereinafter "Groupon"), is a foreign corporation, with its principal place of business located at the above-captioned address and doing business in Luzerne County in the Commonwealth of Pennsylvania.

5.      At all times relevant, Groupon has had continuous, substantial and systematic contacts with the Commonwealth of Pennsylvania and County of Luzerne by delivering and selling its products to dealers and/or consumers within Luzerne County, Pennsylvania; Groupon regularly, systematically and continuously solicits and engages in business in the Commonwealth of Pennsylvania and County of Luzerne, wherein it derives substantial revenue from selling its products.

6.      On or about June 3, 2015, Defendant Groupon sold, to Plaintiff, a telescopic ladder (hereinafter "The Ladder").

7.      Defendant Oxgord designed and manufactured The Ladder prior to Defendant Groupon selling The Ladder to Plaintiff.

8.      The Ladder was designed such that a user could extend the ladder to a desired height by unstacking pre-configured rungs.

9.      When The Ladder was properly extended, the rungs were designed to "lock" into a secure position via "pins" connected to each side-rail.

10.     The only indication The Ladder provided to the user to signal a securely locked rung was the sound of a "click."

11.     There was no visual indication on The Ladder upon which the user could rely to confirm The Ladder was properly locked in place.

12.     The Ladder was designed to remain securely extended once the respective rungs were locked in place, thereby permitting a user to ascend and descend The Ladder without incident.

13.     On or about August 12, 2020, Plaintiff extended The Ladder and believed all extended rungs were secure.

14.     Plaintiff relied on the sound of a "click" to confirm each rung was locked.

15.     On or about August 12, 2020, after securing each extended rung, Plaintiff climbed The Ladder.

16.     The Ladder was extended to such a height so as to safely rest on a platform and apparently secured so as to support Plaintiff's weight.

17.     On or about August 12, 2020, Plaintiff ascended and descended The Ladder multiple times without difficulty while he performed his task.

18.     While Plaintiff ascended The Ladder for the final time, suddenly, and without warning, one of the extended rungs collapsed, thereby causing the height of The Ladder to no longer reach Plaintiff's platform and causing The Ladder to fall.

19.     As a result of the above-described incident, Plaintiff was caused to fall several feet to the ground and sustained, severe, traumatic, permanent injuries as described herein.

20.     At the time of the above-described incident, Plaintiff was using The Ladder in a foreseeable manner prescribed by Defendants and for the purpose for which The Ladder was designed, manufactured and sold.

21.     The aforementioned incident was due to no fault on the part of Plaintiff.

22.     Plaintiff was severely injured as a result of the above-described incident, which injuries include, but are not limited to: closed fracture of the left orbit; vision loss; retinal break; fracture of the neck and greater tuberosity of the left humerus; pain and swelling to the shoulder and face; head injury; and injury to his nerves/nervous system.

23.     As a direct and proximate result of the Defendants' negligence and carelessness described herein, Plaintiff suffered injuries which necessitated, and will continue to necessitate, ongoing medical treatment.

24.     As a direct and proximate result of the Defendants' negligence and carelessness described herein, Plaintiff has expended and will in the future expend, large sums of money for medical attention.

25.     As a direct and proximate result of the Defendants' negligence and carelessness described herein, Plaintiff has endured and will in the future endure, great physical and emotional pain, suffering, disability, inconvenience and distress.

26.     As a direct and proximate result of the Defendants' negligence and carelessness described herein, Plaintiff is and will be, prevented from pursuing and enjoying his usual daily activities, attending his duties and chores and from assuming or resuming employment.

27.     As a direct and proximate result of the Defendants' negligence and carelessness described herein, Plaintiff has and/or may in the future, undergo multiple surgeries, lengthy rehabilitation and a lifetime of pain and permanent disability despite medical intervention.

**COUNT I**
**NEGLIGENCE**
**DOMENICO BUONSANTE V. OXGORD, INC. and GROUPON, INC.**

28.     Plaintiff incorporates by reference the allegations contained in Paragraphs 1 through 27, inclusive, as fully as though the same were set forth at length.

29.     Defendants had a duty to exercise due care in the design, testing, manufacture, assembly, distribution, marketing and sale of The Ladder so as to provide consumers, including Plaintiff, with the necessary protections including a securely extended ladder incapable of unexpectedly collapsing and/or a ladder that reliably and accurately signaled The Ladder was securely extended.

30.     Defendants had a duty to design, test, manufacture, assemble, distribute, market and sell products that were not unreasonably dangerous to those consumers, including the Plaintiff, who are/were reasonably expected to purchase and use the products.

31.     Defendants had a duty to warn Plaintiff of dangerous conditions of which they were aware, or should have been aware, including, but not limited to, the possibility that The Ladder could unexpectedly collapse and/or the possibility that the Ladder was not securely extended.

32.     The carelessness and negligence of Defendants consisted inter alia of the following acts and omissions:

    a.     Failing to use due care in the designing, testing, manufacturing, assembling, distributing, marketing and selling of The Ladder;

    b.     Failing to design and/or manufacture The Ladder with appropriate safeguards so as to warn Plaintiff when The Ladder was not securely and/or properly extended;

    c.     Designing, testing, manufacturing, assembling, distributing, marketing and selling The Ladder in such a negligent manner so that it was unreasonably dangerous for the uses for which it would ordinarily and foreseeably be put at the time that Defendants placed it in the stream of commerce;

d. Failing to properly and adequately test The Ladder for safe use in ordinary operation, due to the hazard(s) created by the product's design and consequent risk of injuries in ordinary operation;

e. Failing to reasonably warn consumers, including the Plaintiff herein, of the unreasonably dangerous condition of The Ladder;

f. Failing to reasonably warn Plaintiff that The Ladder may unexpectedly collapse;

g. Failing to reasonably warn Plaintiff that The Ladder may not be securely extended;

h. Placing The Ladder, with the above-mentioned defects, into the stream of commerce despite having had prior knowledge that those defects existed or could exist in those particular models;

i. Failing to recall The Ladder for the purpose of correcting the defects identified above, despite having received or having knowledge of the inordinately large number of complaints or incidents; and

j. Violation of Defendants statutory duty to maintain the safety of The Ladder.

33. As a direct and proximate result of the Defendants' failure to exercise reasonable care in the design, testing, assembling, manufacture and distribution of The Ladder, the Plaintiff sustained the damages described herein.

34. Defendants' aforesaid negligence was so wanton and willful as to evidence a conscious disregard for the rights of the consuming public, including the rights of the Plaintiff herein.

WHEREFORE, Plaintiff Domenico Buonsante claims damages against Defendants Oxgord Inc. and Defendant Groupon, Inc., jointly and severally, in an amount in excess of Fifty Thousand ($50,000) dollars.

### COUNT II
### STRICT LIABILITY
### DOMENICO BUONSANTE V. OXGORD, INC. and GROUPON, INC.

35.     Plaintiff incorporates by reference the allegations contained in Paragraphs 1 through 34, inclusive, as fully as though the same were set forth at length.

36.     The Ladder at issue in this suit was designed, manufactured, constructed, assembled, marketed, distributed and/or sold by and through agents and/or representatives of Defendants Oxgord and Groupon.

37.     The Ladder was in a defective condition at the time it left the possession and control of Defendants and was not substantially changed prior to the time of Plaintiff's incident referenced herein.

38.     At the time The Ladder was placed into the stream of commerce, the Defendants knew or should have known that The Ladder would be used by persons such as the Plaintiff in the manner and application in which The Ladder was being used at the time of Plaintiff's incident.

39.     The Ladder was defective and in an unreasonably dangerous condition, as aforesaid, when it left the Defendants' hands and remained defective and unreasonably dangerous at all times until ultimately causing Plaintiff's injuries, making the Defendants strictly liable in tort for the Plaintiff's injuries described herein.

40.     The aforementioned defects and resulting dangers were unknowable and unacceptable to Plaintiff and/or a reasonable person would conclude that the probability and seriousness of harm caused by the product outweighed the burden or cost of precautions required.

41.     Defendants, as designer, tester, manufacturer, assembler, seller and distributor of The Ladder, had a duty to supply purchasers and consumers with a ladder that was free of manufacturing and design defects, and which were fit and safe in all respects for their intended use, including in particular a ladder which would securely extend incapable of unexpectedly collapsing and/or a ladder that reliably and accurately signaled The Ladder was securely extended.

42.     The Ladder was defectively manufactured and remained defective and unreasonably dangerous at all times until ultimately causing the Plaintiff's injuries, making the Defendants strictly liable in tort for the Plaintiff's injuries sustained in the aforementioned incident.

43.     At the time the Defendants placed The Ladder into commerce, there were safer alternative designs for ladders which were economically practicable under the circumstances that would, in reasonable probability, have prevented or significantly reduced the injuries to Plaintiff herein.

44.     The Defendants' failure to provide a safer alternative design under the circumstances legally dictates that the Defendants are strictly liable in tort for Plaintiff's injuries.

45.    In addition to the aforementioned defects, The Ladder was unreasonably dangerous in that it did not contain adequate instructions or warnings for proper and safe use. They did not instruct or warn as to the manner to avoid the risks and the dangers involved, in particular, the dangerous propensity of The Ladder to unexpectedly collapse and they did not provide an adequate indicator to signal to Plaintiff if the ladder was not securely extended.

46.    The defects set forth in the preceding paragraphs made The Ladder defective for its intended and reasonably foreseeable use, for which the Defendants are strictly liable in tort to the Plaintiff.

47.    The use of The Ladder by Plaintiff was a normal use, which was or should have been anticipated by Defendants.

48.    Defendant's strict liability makes them responsible for all of the damages sustained and claimed by the Plaintiff as described herein.


WHEREFORE, Plaintiff Domenico Buonsante claims damages against Defendants Oxgord Inc. and Defendant Groupon, Inc., jointly and severally, in an amount in excess of Fifty Thousand ($50,000) dollars.


## COUNT III
## BREACH OF IMPLIED WARRANTY OF FITNESS AND/OR MERCHANTABILITY
## DOMENICO BUONSANTE v. OXGORD INC. and GROUPON INC.

49.    Plaintiff incorporates by reference the allegations contained in Paragraphs 1 through 48, inclusive, as fully as though the same were set forth at length.

50.    Defendants impliedly warranted that The Ladder was of merchantable quality and was fit for the purposes and uses for which they were intended.

51.     Plaintiff relied on the manufacturer's implied warranty of merchantability and fitness when he purchased The Ladder.

52.     By reason of the defective conditions aforementioned, The Ladder was not of merchantable quality and was not fit for their intended use.

53.     Defendants breached the implied warranty of fitness and/or merchantability with respect to The Ladder by designing, manufacturing and selling them in an unreasonable condition unsuitable for the uses which it would ordinarily and foreseeably be put.

54.     As a direct and proximate result of the Defendants' breach of implied warranty of merchantability and fitness for a particular purpose, Plaintiff suffered the severe and permanent injuries as aforesaid, as incorporated herein for which he claims damages.

WHEREFORE, Plaintiff Domenico Buonsante claims damages against Defendants Oxgord Inc. and Defendant Groupon, Inc., jointly and severally, in an amount in excess of Fifty Thousand ($50,000) dollars.

### COUNT IV
### CONCETTA BUONSANTE V. OXGORD, INC. AND GROUPON, INC.
### LOSS OF CONSORTIUM

55.     Plaintiffs incorporate all averments contained in paragraphs 1 through 54 as though they were set forth at length herein.

56.     As a direct and proximate result of the aforesaid negligence of the Defendants, Plaintiff Concetta Buonsante suffered and will continue to suffer the loss of consortium, companionship and society of her husband.

WHEREFORE, Plaintiff Concetta Buonsante claims damages against Defendant Oxgord

Inc. and Defendant Groupon, Inc., jointly and severally, in an amount in excess of Fifty

Thousand ($50,000) dollars.


LOWENTHAL & ABRAMS, P.C.

BY:  _____

EDWARD M. GRANT, ESQUIRE

Date:  September 28, 2021

## VERIFICATION

I, **CONCETTA BUONSANTE**, Plaintiff in this action, verify that the statements made in the foregoing **Complaint** are true and correct to the best of my knowledge, information and belief. I understand that the statements herein are made subject to the penalties of 18 Pa. C.S § 4904 relating to unsworn falsification to authorities.

Concetta Buonsant

CONCETTA BUONSANTE

Dated: September 28, 2021

## VERIFICATION

I, **DOMENICO BUONSANTE**, Plaintiff in this action, verify that the statements made in the foregoing **Complaint** are true and correct to the best of my knowledge, information and belief. I understand that the statements herein are made subject to the penalties of 18 Pa. C.S § 4904 relating to unsworn falsification to authorities.

DOMENICO BUONSANTE

Dated: September 28, 2021

## CERTIFICATE OF COMPLIANCE

I certify that this filing complies with the provisions of the Public Access Policy of the

Unified Judicial System of Pennsylvania: Case Records of the Appellate and Trial Courts

that require filing confidential information and documents differently than non-confidential

information and documents.


Submitted by: Edward M. Grant, Esquire

Signature: _____

Name:         Edward M. Grant, Esquire

Attorney No.: 314095

Date:           September 28, 2021